606 P.2d 944

David HATFIELD, Plaintiff-Respondent,

v.

MAX ROUSE & SONS NORTHWEST, a Nevada Corporation, and Koyle Hatfield, Defendants-Appellants.

No. 12519.

Supreme Court of Idaho.

Jan. 9, 1980.

Rehearing Denied March 17, 1980.

Scott W. Reed, Coeur d'Alene, Clifford A. Hemmerling of Pettit & Martin, Roy G. Weatherup, Los Angeles, Cal., for defendants-appellants.

Thomas A. Mitchell, Coeur d'Alene, for plaintiff-respondent.

McFADDEN, Justice.

This action arises out of an auction sale conducted by defendant-appellant Max Rouse & Sons Northwest, a Nevada corporation (Rouse), held in Hayden Lake, Idaho, on February 22, 1975. The sale was held to liquidate Hatfield Logging owned by Koyle Hatfield of Bonners Ferry, Idaho. Hatfield contacted Rouse's Seattle representative, John Poysky, in late 1974, and Poysky, along with the auctioneer and principle shareholder of the Rouse auction firms, Harold Rouse, visited Hatfield, viewed his equipment, and discussed the sale.[1]

Koyle's son, David Hatfield, plaintiff-respondent, also had a logging business in the Bonners Ferry area, and at this time also desired to reduce his inventory of equipment. With Rouse's consent, he decided to include some of his equipment in his father's auction. In particular David wished to sell two Model 667 Clark log skidders. David's two skidders, and two nearly identical ones which belonged to Koyle, were among the most expensive items at the sale. Their fair market value at that time was $25—30,000, according to expert testimony at trial, and because of a contemporary decline in logging equipment prices, their sale was of particular concern to the two. As a result a conversation took place about fifteen minutes before the sale, in which the skidders were discussed. Koyle and his son-in-law, Frank Hanks, who was also in the logging business, and Poysky and Harold Rouse took part.

What was actually said during the conversation was disputed by the parties at trial. Koyle maintains that he told Harold Rouse and Poysky that he required a minimum price on all four of the skidders—$30,000 on each of his own and $26,000 on each of David's. According to Koyle, John Poysky assured him that there were bidders who would offer as much as $32,000 for the skidders. Both Harold Rouse and John Poysky testified that Koyle expressed concern about the skidder market, and was worried about the skidders' sale price. Poysky testified that he advised Koyle that he should protect his skidders by having his son-in-law Hanks bid on them for him until they reached the minimum sale price. Neither Harold Rouse nor Poysky testified that Koyle explicitly agreed to such a scheme but both say they understood after the conversation that this method would be used by Koyle to protect his skidders.

The first two skidders to be sold at the auction were Koyle's. Hanks was high bidder on both at $27,500 for the first and $27,000 for the second. At trial Hanks testified that he had come to the sale to buy at least one skidder for his own use, that he had ultimately purchased both of Koyle's

---

1. Bidders at Rouse's sales participate by acquiring bidding numbers before the sale which are then used to signal bids and for the auctioneer to announce completed sales. Rouse collects all sale proceeds and after making certain deductions forwards the balance to the seller. These deductions typically include commission, advances and advertising costs. As part of the auction agreement, Rouse advertised the sale in trade journals and through direct mail contacts.

skidders because they sold for good prices, and that at the time of trial they were both in active use in his logging business. The sale price of these machines was not paid to Rouse, however, since by private arrangement after the sale Hanks assumed Koyle's outstanding notes on the two skidders and undertook a personal obligation to Koyle for the remainder of the sale price.

David's two skidders were on the block next. Harold Rouse, the auctioneer, opened the bidding on the first at $13,500, and when no bids were forthcoming, he announced its "sale" to a "blind number." The number did not actually represent a purchaser, but was used by the auctioneer to avoid announcing that an item would not sell, which apparently destroys the momentum of a sale. Inasmuch as no bids were received on this first skidder at $13,500, Harold Rouse opened the bidding on David's second skidder at $10,000. A bid of $12,000 was then offered by Paul Zimmerly. Harold Rouse testified that he expected Hanks to step in to protect the skidder, but when he didn't he felt he had no choice but to declare the skidder sold to Zimmerly for $12,000.

Immediately after the sale, David and Koyle approached John Poysky, and explained that the sale of David's two skidders at such low prices was "ruinous" because David owed some $22,000 on each. Poysky said that the first skidder had not actually been sold and explained the blind number arrangement. He acknowledged that the second had been sold for $12,000 but said that he would try to retrieve it. He returned shortly and announced that he had convinced Zimmerly to release the skidder. Zimmerly testified that he initially agreed with Poysky to let David have the skidder back, but that his partner at the sale later stood firm and demanded the right to retain it. Rouse acknowledged this right and Zimmerly took the skidder.

Because of this and other disputes, both Koyle and David were displeased with the sale, and Koyle later consulted his attorney who in turn contacted Rouse's attorney. Negotiations aimed at resolving the dis-

putes ensued during March and April of 1975. When a compromise was reached, Rouse's attorney had a check issued jointly to Koyle and David and to Koyle's attorney and to the Bank of Idaho (the lienholder on Koyle's and David's equipment) which reflected the amount of the sale proceeds as determined by negotiation. Language typed on the back of the check stated that endorsement amounted to a release of all claims against Rouse.

David was dissatisfied with the terms of the settlement and refused to endorse the check with its release clause. His father, on the other hand, was in need of his share of the proceeds of the sale, which could not be obtained without David's endorsement of the multiple-payee check. Friction ensued between the two.

Ultimately David retained his own attorney who commenced negotiations with Rouse by demanding that David's and Koyle's proceeds be segregated. After Rouse's attorney refused to do so, David filed a complaint on May 16, 1975. The complaint named Rouse and Koyle as defendants. It prayed the court to enjoin Koyle from harassing David to endorse the check and to order Rouse to segregate the funds. It also prayed for damages from Rouse as follows: $27,500 for the loss of the skidder to Zimmerly; $25,000 for emotional distress and $125,000 punitive damages for Rouse's issuance of the multiple payee check with release clause. Two months later Rouse voluntarily segregated the funds and Koyle ceased active participation in the lawsuit.

Trial was held on March 11 and 12, 1976, and the jury awarded David $25,000 for breach of contract, $10,000 for emotional distress and $110,000 punitive damages. A judgment for these amounts, plus interest and costs was entered on March 22, 1976. After Rouse's motions for a new trial and for a judgment notwithstanding the verdict were denied it took this appeal.

On appeal Rouse contends that the trial court erred in admitting plaintiff's exhibit no. 10; in allowing evidence of David's emotional distress and in making an award

of damages for emotional distress; and that the evidence did not support the jury's award of punitive damages, or, alternatively that the award was excessive.

Respondent has also filed two motions to dismiss this appeal. We address these motions first.

I.

Respondent's first motion to dismiss is based on confusion surrounding the proper designation of the corporate party defendant in this action. This confusion exists because the Rouse auction business is carried on by an indeterminate number of separate corporate entities, each of which is headed by Harold Rouse. The original complaint named as corporate defendant "Max Rouse & Sons, Inc., a foreign corporation, doing business in Idaho under the firm name and style of Max Rouse & Sons Northwest." The answer by Rouse's attorney entitles the defendant as "Max Rouse & Sons Northwest, a Nevada Corporation." Subsequently all the pleadings by both plaintiff and defendant utilized the Max Rouse & Sons Northwest appellation, yet the judgment entered by the district court returns to the original Max Rouse & Sons, Inc. label. Respondent argues that all this indicates that there were multiple parties to this lawsuit, and that since the entry of judgment named only one of them it is not final under I.R.C.P. 54(b), and absent that rule's certification this appeal cannot proceed.

However, the parties also entered into a stipulation dated October 19, 1976, which states that the proper party in the lawsuit was "Max Rouse & Sons Northwest, a Nevada corporation," and the district court ordered that the stipulation be given effect. At oral argument counsel for respondent took the position that this put Max Rouse & Sons, Northwest *in* the lawsuit, but that it did not take Max Rouse & Sons, Inc. *out.* This argument is without merit. Pursuant to the stipulation, we hold that the proper corporate defendant is "Max Rouse & Sons Northwest, a Nevada corporation," and that the appeal may proceed without Rule 54(b) certification.

Respondent next calls our attention to the "Partial Satisfaction of Judgment" effected May 10, 1976, in which Rouse apparently payed to David Hatfield $11,489.20. Appellant traces this amount to a stipulation entered between the parties before trial on July 16, 1975. Under that stipulation Rouse finally segregated the sale proceeds, and issued a check to Koyle for his portion. It then placed $15,221.55, the remainder of its original multiple-payee check, in an interest bearing account pending the outcome of the trial. $11,489.20 was left after deductions for commission and a ratable share of advertising expenses. According to appellant, it was never contested that this amount was due and owing David Hatfield.

Respondent's position is based on the doctrine of election of remedies. The doctrine comes into play whenever a party is faced with two mutually inconsistent options such that to elect one is necessarily to forego the other. *Radioear Corp. v. Crouse,* 97 Idaho 501, 505, 547 P.2d 546, 549-50 (1976). Respondent takes the position that there was never a "judicial admission" that this amount was due and owing, that the partial satisfaction of judgment amounts to an acquiescence in the judgment, that an appeal is inconsistent with that acquiescence, and that we should therefore dismiss the appeal.

It is apparent that the payment to Hatfield represented the remainder of the amount held in the interest-bearing account pending the resolution of this case. It is thus partial satisfaction of the award of $25,000 made by the jury for breach of contract, and Rouse has not taken an appeal from this portion of the verdict. There is Idaho authority for the position that partial payment of a judgment is not inconsistent with an appeal. *Backman v. Douglas,* 46 Idaho 671, 270 P. 618 (1928). But it is clear that even complete satisfaction of one portion of a verdict does not preclude appeal from other independent portions of it. *Henderson v. Nixon,* 66 Idaho 780, 786, 168 P.2d 594, 596 (1946).

Both of respondent's motions to dismiss are denied.

## II.

■ Appellant first contends that the trial court erred in admitting plaintiff's exhibit no. 10, a letter from Rouse's attorney, to David's attorney, dated April 25, 1975.[2] Because the letter was part of an ongoing settlement negotiation we hold that it was error for the trial court to admit any part of it.

It is important to understand the context in which this letter was sent. In point of time, it was mailed some two months after the auction sale took place. Koyle and his attorney had contacted Rouse's attorney in an attempt to settle the matter of David's skidder. After a series of letters and telephone calls, a compromise was reached. Because the compromise was not satisfactory to David he then retained separate counsel, who entered the fray with a letter dated April 10, 1975. Three letters between Rouse's counsel and David's counsel followed, including the letter of April 25, plaintiff's exhibit 10. These letters extend-ed the attempts at a settlement, which ultimately failed.

One argument is that offers of settlement, even the willingness to discuss settlement, bear on a party's view of its liability and are hence relevant and admissible in evidence. The theory is that the person in a strong position, confident of victory, is happy to proceed to trial. The willingness to settle suggests a perception of weakness.

The position that evidence of such offers should not be admissible, however, proceeds upon one of two theories. Contrary to the above logic the first simply denies the relevance of such offers as bearing on the issue of liability. Naturally a small settlement offer for a large claim suggests an admission of liability less clearly than one which more nearly approaches the actual amount of the claim. Cleary (ed.), McCormick on Evidence, § 274, p. 663 (2d ed. 1972). But the costs of pressing or defending even an indisputable claim can be significant, and claims may fail for reasons other than flaws in their legal foundation. An offer of the full amount of a claim would of course be relevant, but anything substantially less

2. The letter contained seven paragraphs, two of which made specific reference to settlement figures and were ordered deleted by the trial court as a condition of the letter's admission. As admitted, the letter read as follows:

"Stephen Bistline, Esq.
101 North First Avenue
Sandpoint, Idaho 83864
Re: Rouse-Hatfield Sale
Dear Mr. Bistline:
In reply to your letter of April 23, 1975 you are advised as follows:
1. Prior to the auction Koyle and David Hatfield told my client that certain pieces of equipment should not be sold unless they received a certain minimum bid from outside parties. Four peices [sic] of equipment were within this group that the Hatfields desired to be sold with reserve. At that time my client made it very clear to both of the Hafields that *they* did not participate in an auction where *they* were responsible to obtain minimum outside bids and informed both of the Hatfields that if they wanted to protect any piece of equipment that they would have to be responsible to do so.
2. None of the equipment was "protected" by my client. Three pieces of equipment that your clients desired to "protect" were bought-in by your client.

3. The one piece of equipment that was sold for some reason was not bid on by your client. My client had no way to know that your client had "dropped the ball" and could assume only that it was to be sold to the highest bidder.
4. Your reference to $15,000 loss is difficult to understand since the amount that your client wanted the subject piece to be protected for before the sale (but my client refused to do) was $20,000. That piece was sold for $12,000 and considering that the auction contract called for a 6% commission, the maximum that I can see that your client can even wrongfully contend he has been damaged is 94% of $8,000 which amounts to $7,520.
6. With regard to the last paragraph of your letter, I wish to categorically deny your charges. The terms and conditions set forth on the agreement signed by all purchasers is standard language that is used by my client in all of his auctions, which your client knew long in advance of the time of the sale. Very truly yours,
LABOWE & VENTRESS [signed] Ronald B. Labowe
Ronald B. Labowe
cc: Max Rouse & Sons, Inc."

would not necessarily be. Bell, Admissions Arising out of Compromise—Are they Irrelevant? 31 Tex.L.Rev. 239, 243–4 (1953).

The second theory looks not to relevancy, but to a privilege for settlement negotiations. Settlements are favored because they reduce judicial backlog and bring disputes to a prompt conclusion. To encourage resolution of cases by settlement, evidence gained in negotiation is excluded.

In the past both these theories have been applied with a crucial caveat, which stated that if a statement of fact, as opposed to one of opinion, were made in the course of the settlement negotiations it would be admissible in evidence unless prefaced by language such as "for the purposes of argument only," or "without prejudice." Dictum in an early Idaho case is to this effect. *Whitney v. Cleveland*, 13 Idaho 558, 91 P. 176 (1907).

■ The modern approach is to exclude *all* statements made in the course of settlement negotiations. This is the position adopted by the Federal Rules of Evidence. "Rule 408—Compromise and Offers to Compromise "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving a bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Federal Rules of Evidence 408.

This position has also been widely recommended by the commentators. *E. g.*, Cleary (ed.), McCormick on Evidence, § 274, p. 664 (2d ed. 1972); McCormick, Evidence § 76 (1954); Weinstein and Berger, Weinstein's Evidence, ¶ 408[02], pp. 408–14 to 408–19 (1979); 2 Louisell and Mueller, Federal Evidence, § 170, pp. 271–3 (1978); Bell, Handbook of Evidence for the Idaho Lawyer, 78–9 (2d ed. 1972).

Because of its encouragement of settlement negotiations, the Federal Rule's blanket prohibition is the best position on the question, and the one we adopt. Accordingly *Whitney v. Cleveland, supra*, to the extent that it is inconsistent with this position, is overruled. It was error for the trial court to admit plaintiff's exhibit 10. Under our resolution of the remaining issues in this case, however, we need not decide whether this error was prejudicial.

### III.

We now turn to appellant's claim that the trial court erred in taking evidence of and awarding damages for emotional distress. For purposes of analysis, claims for damages for emotional distress may be asserted in at least two ways. The claims may be asserted as part of the measure of recovery for some independent wrong perpetrated on the plaintiff by the defendant, such as a breach of contract. They may also be asserted in connection with the independent torts of negligent or intentional infliction of emotional distress.

### A.

■ Since Rouse on appeal concedes that it breached its contract with David by selling his skidder for less than a specified minimum price, the question which we first confront is whether emotional distress may be part of the measure of damages for a breach of contract.[3] This question has nev-

---

**3.** On appeal respondent argues that the award of damages for emotional distress could be based on the "ruinous sale," on Rouse's refusing to give David the money he had coming,

and damage to (deprivation of) David's property, to wit, the $12,000. These actions actually manifest Rouse's breach of contract and are considered below. In addition, respondent ar-

er previously been considered by this court. The general rule from other jurisdictions is that it may be only when the breach is wanton or reckless and where either such damages were within the contemplation of the parties at the time they formed the contract, *Hadley v. Baxendale*, 9 Ex. 34, 156 Eng.Rep. 145 (1854), and where the breach of contract also causes physical injury. The Restatement of Contracts puts it this way:

> "In actions for breach of contract, damages will not be given as compensation for mental suffering, except where the breach was wanton or reckless and caused bodily harm and where it was the wanton or reckless breach of a contract to render a performance of such a character that the defendant had reason to know when the contract was made that the breach would cause mental suffering for reasons other than mere pecuniary loss." Restatement of Contracts § 341 (1932).

The restatement view has been widely followed. *E. g., Zamzok v. 650 Park Aven. Corp.,* 80 Misc.2d 573, 363 N.Y.S.2d 868 (1974); *see generally* 11 Williston, Williston on Contracts, § 1341, pp. 214–23 (3d ed. 1968).

In this case, no physical harm is claimed either to have caused or resulted from the alleged emotional distress. As a matter of law, then, the award could be based on the breach of contract only if such harm were within the contemplation of the parties at the time they formed the contract, and if the breach were wanton or reckless.

Appellant urges upon us the distinction between commercial and noncommercial contracts, and would have us hold that in the former damages for emotional distress may never be awarded for a breach because they are never contemplated by the parties. A number of courts have adopted this distinction. *E. g., Meyer v. Nottger,* 241 N.W.2d 911 (Iowa 1976) (breach of a contract to embalm and bury a dead body held "non-commercial"); *Stewart v. Rudner,* 349 Mich. 459, 84 N.W.2d 816 (1957) (breach of a contract to perform a Caesarean section held "non-commercial"). In close cases, however, defining the distinction between "commercial" and "non-commercial" contracts is simply another way of putting the question, which remains, of course, whether the parties to the contract considered emotional well-being a part of its subject matter. Evidence of the commercial nature of the contract may bear on that question, but it does not absolutely decide it. The answer will always turn on the facts of the particular case.

It is simply impossible to imagine that the parties to the contract in this case contemplated that David might suffer emotional distress upon its breach. The auction agreement itself is a straightforward document which makes Rouse David's exclusive agent for the sale of the equipment listed in the agreement.[4] Neither the subject matter of the contract nor any of its terms suggest that the parties saw it as other than an agreement to secure monetary advantage to both.

gues that emotional distress damages could be based on Rouse's "fraudulent conduct."

Without considering Rouse's contention that fraud was not pled with particularity, I.R.C.P. 9(b); *Matthews v. New York L. Ins. Co.,* 92 Idaho 372, 443 P.2d 456 (1968), and not proved, it is nonetheless clear that the determination of whether damages for emotional distress are allowable as part of the measure of recovery for fraud would follow an analysis similar to the one we follow below for breach of contract. "It is only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered." Prosser, Law of Torts, § 110, p. 732 (4th ed. 1971). In other words, resolution of the question would turn on foreseeability, and would be gov-

erned by the same observations we make in resolving the contract issue.

We also note that the court's decision in *Barlow v. International Harvester,* 95 Idaho 881, 522 P.2d· 1102 (1974), based as it is on the tort of intentional interference with contract, is inapposite.

4. While David did not sign the auction agreement, Rouse knew of and assented to the inclusion of his skidders in the sale, and in the pleadings David states that he "felt bound" by the agreement. We consider Koyle and David partners in the sale, and consider that Koyle's signature on the agreement bound David as well.

Nor does anything about the circumstances surrounding the formation of the contract suggest that Rouse had undertaken more than typical business obligations. The record shows that David, while young, was anything but inexperienced. At 28, he was married, had been in the service, and had his own substantial logging business. He described it as follows at trial:

"I had two Clark skidders and a yard and a quarter American Heel Boom and a D6C Cat and miscellaneous. I had a pretty good sized logging operation, and I had six men hired, and we put out about a million feet a month."

He had also been to numerous auction sales before, and had some sense of how they worked. There is no reference in the record to any facts which would have apprised Rouse of a special susceptibility to emotional distress on David's part. It does not even appear that Rouse was aware at the time of sale that David's skidder was encumbered.[5]

The trial court instructed the jury that "it is the duty of the auctioneer strictly to observe and obey instructions from the seller, and if he fails to do so, he is liable for any resulting loss" (Instruction no. 11). To the extent that this instruction could be read to mean that an auctioneer automatically is liable for emotional distress which results from its breach of its auction agreement, it is an incorrect statement of the law. The auctioneer is an agent of the seller, and the scope of an agency is based upon the manifestations of the parties. The duties which arise are determined solely by reference to these manifestations. Restatement 2d of Agency, § 376 and Comment a (1958); *E. S. Harper Co. v. General Ins. Co. of America,* 91 Idaho 767, 771, 430 P.2d 658, 662 (1967). The Restatement 2d of Agency, § 400 (1958), states that the

liability of an agent who breaches his contract with his principal is governed by the principles stated in the Restatement of Contracts. This is buttressed by Comment e to § 401 of the Restatement 2d of Agency: "If an agent acts contrary to the principal's orders or if he fails to act as directed in the control of the principal's things, and a loss to the principal results from such disobedience or failure to act, the agent is subject to liability for such loss if the loss is within the risk created by the disobedience . . . ."

In other words, no responsibility for emotional distress magically came into being simply because Rouse and Hatfield had entered an agency or fiduciary relationship.

In short, this was not a contract to perform services which foreseeably would lead to emotional distress upon breach. *See e. g., Stewart v. Rudner, supra* (contract to perform cesarian section); *Meyer v. Nottger, supra* (contract to bury a body); *Lewis v. Holmes,* 109 La. 1030, 34 So. 66 (1903) (contract to deliver a bride's trousseau). Nor did anything about the situation surrounding the formation of the contract indicate that either party contemplated emotional distress as a result of breach. Of course, the breach of any contract which the parties consider important predictably will lead to some emotional distress. Life in the competitive commercial world has at least equal capacity to bestow ruin as benefit, and it is presumed that those who enter this world do so willingly, accepting the risk of encountering the former as part of the cost of achieving the latter. Absent clear evidence to the contrary we will not presume that the parties to a contract such as the one before us meant to insure each other's emotional tranquility.

---

5. Only Koyle signed the auction agreement, and Rouse's check of UCC financing statements was thus conducted under his name only. The Bank of Idaho wrote a letter to Rouse dated three days before the day of the auction which disclosed its lien but the letters may not have arrived before the sale took place. In any case the seller warrants in the auction agreement that title to all property

"will be free and clear of all liens, claims and encumbrances at time of auction." Even if we assume that Rouse knew of David's outstanding obligation on the equipment at the time of contracting, it is another matter altogether to assume that it therefore undertook the obligation to protect David from the emotional distress which would accompany the sale of the equipment for much less than its actual value.

Besides showing that emotional distress was part of the subject matter of the contract the Restatement view also requires the plaintiff to show that the breach was wanton or reckless. Because our decision on this issue turns on our finding that the contract did not encompass emotional distress we express no opinion as to whether we would include the requirement of wanton or reckless breach in future cases.

## B.

▌ The treatment of the intentional infliction of emotional distress as a tort in itself, in the absence of a physical injury, is relatively new to the law. English common law courts flatly refused to recognize such a cause of action, e. g., *Lynch v. Knight*, 11 Eng.Rep. 854 (1861); *Allsop v. Allsop*, 157 Eng.Rep. 1292 (1861), and this position was uniformly followed by early American courts. *See* Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich. L.Rev. 874 (1939); Comment, Iowa Tort Liability for the Intentional Infliction of Emotional Distress, 62 Iowa L.Rev. 1141 (1977). The position was unbending: damages for emotional distress would be awarded only when they resulted from physical injury caused by "impact" upon the plaintiff by the defendant, *Spade v. Lynn & Boston R. R.*, 168 Mass. 285, 47 N.E. 88 (1897); *Mitchell v. Rochester Ry. Co.*, 151 N.Y. 107, 45 N.E. 354 (1896); *Huston v. Freemansburg*, 212 Pa. 548, 61 A. 1022 (1905); or where there existed a special relationship between the parties, such as that between a common carrier and its customer. Prosser, Law of Torts, § 12, pp. 52–4 (4th ed. 1971).

In hewing to this rule, the courts cited the difficulty of proving the presence of emotional distress and measuring the loss it caused in monetary terms, the resulting difficulty of tying the actions of the defendant proximately to the distress of the plaintiff, the presumed triviality of harm involved, and the possibility of a flood of fraudulent litigation. Prosser, *supra;* 38 Am.Jur.2d Fright, Shock and Emotional Disturbance, §§ 8–12, pp. 11–15; Comment, 54 Iowa

L.Rev. 914, 915 (1969); Cooks, Mental Anguish Arising from Property Damage, 3 So. U.L.Rev. 17 (1976).

Gradually the requirement of impact was relaxed to allow for recovery in cases of "constructive impact." *Sam Finley, Inc. v. Russell,* 75 Ga.App. 112, 42 S.E.2d 452 (1947) (inhalation of smoky and oily dust); *Porter v. Dela., L. & W. R. R.,* 73 N.J.L. 405, 63 A. 860 (1906) (dust in eye). By the 1930's, the trend was to do away with the impact requirement altogether, at least in the presence of outrageous conduct by the defendant which resulted in severe emotional distress on the part of the plaintiff. Official recognition of this position by the American Law Institute came in 1948. Restatement 2d of Torts, § 46 (1948); *see,* Prosser, Insult and Outrage, 44 Calif.L.Rev. 40 (1956).

Dean Prosser and other commentators have recognized the concern of the courts that a rule of law which allows recovery of damages for emotional distress in the absence of any physical injury may lead to the pressing of fraudulent claims. Prosser, The Law of Torts, 328 (4th ed. 1971); Prosser, Insult and Outrage, 44 Calif.L.Rev. 40 (1956); Comment, Iowa Tort Liability for the Intentional Infliction of Emotional Distress, 62 Iowa L.Rev. 1141 (1977). For this reason the tort of intentional infliction of emotional distress is generally held to lie only in the presence of outrageous intentional conduct on the part of the defendant which leads to severe emotional distress. By requiring both conduct of an "outrageous" nature and "severe" emotional distress this rule affords courts a means of limiting fictitious claims. The Restatement view is as follows:

> "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement 2d Torts § 46 (1948).

While the Restatement view does not require physical impact or injury in determining severity, some courts do. *E. g., Harned v. E.–Z. Finance Co.,* 151 Tex. 641, 254

S.W.2d 81 (1953); even if not required, evidence of physical harm of course bears on the severity of the emotional distress.

The record in the case before us does not show severe emotional distress on the part of the plaintiff. There was no testimony of any physical manifestation of the distress, and the subjective testimony suggested the distress was anything but severe. David testified that the multiple-payee check put him "in a pretty awkward position," that "[i]t affected me quite greatly," and that "I felt, I don't know, kind of stupid I guess . . . . And so, there was a lot of mental anguish." David also testified that "I think a lot of people in town wouldn't talk to me. They thought it was kind of chicken, I guess, to sue your own father. . . ."

With respect to the events at the auction sale itself, David testified that he was "too stunned to remember faces," but also that because of his experience at other auctions he simply did not believe that his skidders had actually been sold at such low prices. He even had the presence of mind to remove the keys from the two skidders to impede their removal from the sale site.

Read most favorably to respondent, the evidence shows that David did not want his skidder sold at such a low price and was surprised and angered when he realized that it had in fact been sold. It also shows that the multiple-payee check placed him at cross-purposes with his partner in the auction sale, his father. This anger and awkwardness may not have been pleasant, but it is the kind of discomfort which attends life in the commercial world. As noted above, the record certainly does not disclose that this successful young entrepreneur with six employees and a brisk logging business had any special susceptibility to emotional upset.[6]

The Restatement's requirement of outrageousness also serves to weed out those claims which spring from the normal give

and take of community life. Judge Magruder's now familiar phraseology is as apt today as it was in 1936:

"Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be." Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv.L.Rev. 1033, 1035 (1936).

In defining the term "outrageous," Restatement 2d of Torts § 46, Comment d offers the following:

"The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt."

However one defines what persons can expect from society it is plain that courts have required very extreme conduct before awarding damages for the intentional infliction of emotional distress. *See, e. g., Blakeley v. Shortal's Estate,* 236 Iowa 787, 20 N.W.2d 28 (1945) (defendant's decedent committed suicide in plaintiff's kitchen); *Hill v. Traveler's Ins. Co.,* 154 Tenn. 295, 294 S.W. 1097 (1927) (mutilation of dead body); *Boyle v. Chandler,* 138 A. 273 (Del. Sup.1927) (removal of body from casket); *Price v. Yellow Pine Paper Mill Co.,* 240 S.W. 588 (Tex.Civ.App.1922) (plaintiff's husband brought home in severely injured condition without warning); *Great A. & P. Tea Co. v. Roch,* 160 Md. 189, 153 A. 22 (1931) (wrapping up a dead rat in place of a loaf of bread for a sensitive customer); *Bielitski v. Obadiak,* 61 Dom.L.Rep. 494 (1921) (spreading false rumor that plaintiff's son had hanged himself). Rouse's conduct in this case simply does not rise to the level of outrageousness of these cases.

6. Our decision on this issue does not require us to make findings of fact; indeed, that is the exclusive province of the trial court. The evidence of emotional distress, however, standing

unrefuted and viewed most favorably to plaintiff, compels us to hold as a matter of law that the distress was not sufficiently severe to have justified submission of the issue to the jury.

Accordingly we hold that the tort of intentional infliction of emotional distress does not lie in this case.

### C.

▆ In order for the tort of negligent infliction of emotional distress to lie courts almost universally require that the actions of the defendant cause some physical injury to the plaintiff which accompanies the emotional distress. According to Dean Prosser, the infliction of minor emotional distress,

> "so far from serious that it does no physical harm, is so evanescent a thing, so easily counterfeited, and usually so trivial, that the courts have been quite unwilling to protect the plaintiff against mere negligence, where the elements of extreme outrage and moral blame which have had such weight in the case of the intentional tort are lacking." Prosser, Law of Torts, § 54, p. 329 (4th ed. 1971) (Citation omitted.)

Idaho has followed this majority position. In *Summers v. Western Idaho Potato Processing Co.*, 94 Idaho 1, 479 P.2d 292 (1971), the plaintiff's clothes were ripped off by the machinery she was cleaning, to her distress. The court held that there was "no common law right of recovery" for the negligent infliction of pure emotional distress, that is, for emotional distress in the absence of physical causes or manifestations, and denied the plaintiff's claim. Inasmuch as there was no physical injury involved in this case it is governed by *Summers*, and the tort of negligent infliction of emotional distress also does not lie.

In light of the foregoing we hold that the trial court erred in awarding $10,000 in damages for emotional distress, and that award is reversed.

### IV.

Finally we turn to appellant's contention that the evidence in this case did not support the award of punitive damages.

▆ In Idaho punitive damages are reserved for the most unusual and compelling circumstances. The reason for their disfavor may be their emphasis on punishment and deterrence of the defendant rather than compensation of the plaintiff, an atypical role for civil damages. It is well established that punitive damages "are not a favorite of the law, and the power to give such damages should be exercised with caution and within the narrowest limits." *Williams v. Bone*, 74 Idaho 185, 189, 259 P.2d 810, 812 (1953). This court will sustain an award of punitive damages only when it is shown that

> "there has been an injury to the plaintiff from an act which is an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or a disregard for its likely consequences . . . ." *Linscott v. Rainier Life Ins. Co.*, 100 Idaho 854, 606 P.2d 958 (1980).

A brief review of prior cases which have sustained punitive damages awards illustrates how restrictively the requirement for extreme conduct has been interpreted.

A number of cases have involved threatened or actual conduct of a violent nature. In *Village of Peck v. Denison*, 92 Idaho 747, 450 P.2d 310 (1969), the defendant threatened to destroy or poison an entire town's water supply if it did not settle a dispute with him in his favor. In *Thompson v. Dalton*, 95 Idaho 785, 520 P.2d 240 (1974), defendant, despite notice that he had no legal authority to do so, repossessed plaintiff's mobile home while she was out of town, threatening her health and safety. *See also White v. Doney*, 82 Idaho 217, 351 P.2d 380 (1960).

Other cases have turned on conversion which was attended by particularly egregious circumstances. In *Jolley v. Puregro Co.*, 94 Idaho 702, 496 P.2d 939 (1972), the defendant, despite express warnings, effected the conversion in the course of repossessing a third party's equipment, later sold plaintiff's equipment, and upon plaintiff's demand refused to acquire replacement equipment for him. In *Crystal Dome Oil & Gas Co. v. Savic*, 51 Idaho 409, 6 P.2d 155 (1931), the ousted president of plaintiff, stating that if he could not run the compa-

ny "he would 'wreck it' or tie it up so that all operation would cease," 51 Idaho at 411, 6 P.2d at 156, converted and withheld from the company a geologic report which caused an offer to purchase the company to be withdrawn. And in *Klam v. Koppel*, 63 Idaho 171, 118 P.2d 729 (1941), the defendant converted plaintiff's tractor and sold it for scrap, after disassembling it "by vigorous use of a sledge hammer." 63 Idaho at 176, 118 P.2d at 731.

Another group of cases illustrating conduct which is an extreme deviation from reasonable standards of conduct involves trespasses. In *Lewiston Pistol Club v. Imthurn*, 94 Idaho 264, 486 P.2d 275 (1971), punitive damages were awarded against a lessor who barred its lessee's access to the leasehold and destroyed part of the lessee's property. And in *Cox v. Stolworthy*, 94 Idaho 683, 496 P.2d 682 (1972), defendant destroyed a fence, bulldozed a half-mile road, and proceeded to herd sheep across plaintiff's property. There was also an element of trespass in *Klam v. Koppel, supra*.

Three other unique cases should be mentioned. In *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 453 P.2d 551 (1967), the defendant auto dealership rolled back the odometers on some thirteen used cars and sold them as new. In *Barlow v. International Harvester Co.*, 95 Idaho 881, 522 P.2d 1102 (1974), agents of defendant engaged in a concerted course of conduct designed to destroy the plaintiff's farm equipment dealership. By contacting plaintiff's business partner and primary financier and making false statements that plaintiff had misappropriated funds, that he was incapable of managing the business, that he was a liar and a thief and could be put in jail, and by making false representations of the business's net worth they created a credit atmosphere in which plaintiff's business was forced to close. And finally in *Linscott v. Rainier Life Ins. Co.*, 100 Idaho 854, 606 P.2d 958 (1980), defendant insurance company unilaterally attempted to change the terms of the insurance contract with its insured, wrongfully attempted to rescind

the policies, and refused to pay a valid claim on no ground whatever.

In this case respondent argues that the award of punitive damages could have been based on one or all of three courses of conduct: (1) Rouse's failure to follow Koyle's instructions that David's skidders were not to be sold for less than $25,000; (2) its advice to Koyle that he should assure the minimum price himself by having his son-in-law bid on the skidders; and (3) the actions of Rouse's attorney in issuing the proceeds of the sale in a multiple-payee check with release endorsement which had the effect of pitting father against son, forcing David to choose between compromising his own claim and delaying his father's receipt of the funds due him.

■ Rouse's failure to follow Koyle's minimum price instructions amounted to a breach of contract as the jury apparently found, and as Rouse concedes on this appeal. As we make clear today in *Linscott v. Rainier Life Ins. Co.*, 100 Idaho 854, 606 P.2d 958 (1980), the fact that the underlying dispute is a breach of contract does not of itself preclude an award of punitive damages. The question remains whether the plaintiff was injured as a result of an "extreme deviation from reasonable standards of conduct" which is performed intentionally or recklessly. *Id.* 100 Idaho at 858, 606 P.2d at 962. A glance at the cases discussed above makes it immediately clear that this breach was not a sufficiently extreme deviation from reasonable standards of conduct to merit an award of punitive damages.

Nor does the breach appear to have been intentional or reckless. Harold Rouse testified that he believed that he had no power as auctioneer to refuse to accept a bid which was below a stated minimum, and testified that his standard operating procedure was to refuse to sell items on which a minimum bid was set. That is, he believed his auction sales were all "without reserve," and that once a legitimate bid was received he was bound to accept it. He was thus

operating under a mistake of law.[7] But there is no evidence that he acted intentionally for the purpose of causing a loss to David Hatfield—the evidence in fact is to the contrary. He testified that the sale of lots was done very rapidly, requiring split-second decisions. And everyone agreed that John Poysky was "nice" after the sale, and tried to convince Zimmerly not to take the skidder, despite his clear right to do so. I.C. § 28–2–328(2). Carl Wright, another Rouse employee, also tried to "sweet talk" Zimmerly.

The jury apparently found that the minimum price figure set by Koyle was $25,000. Its award to David of that figure was the proper and exclusive measure of damages for breach of contract.

Rouse's suggestion to Koyle that he procure bids on his own behalf to assure a minimum price for the skidders also fails to present us with evidence to support an award of punitive damages. Such bidding may be grounds for a buyer to avoid the sale. I.C. § 28–2–328(4).[8] Testimony at trial, however, suggests that David Hatfield, John Poysky and Harold Rouse all were aware that sellers occasionally engaged in this practice. David testified that at first he did not believe that his skidders had actually been sold despite the fact that they had been struck off to apparent bidders. He said that his experience at other auction sales led him to believe that sometimes items which appeared to be "sold" turned out not to be. Harold Rouse testified that he was aware that such bidding occasionally went on but that as a practical matter it was impossible to prevent. By comparison to other cases this course of conduct is simply insufficiently outrageous to invoke one of the most extraordinary civil remedies in the arsenal of the law.

It is also axiomatic that the allegedly extreme conduct must have caused plaintiff's loss to justify the award of punitive damages. Rouse's advice, had it been followed, might have *avoided* the loss of David's skidder. We do not of course condone Rouse's advice to Koyle that he procure bids. But it is also clear that it cannot serve as the basis for an award of punitive damages.

Finally, punitive damages may not be grounded on the actions of Rouse's attorney in issuing the multiple-payee check with release statement. It is well established in Idaho that punitive damages may not be assessed against a principal based on the acts of an agent absent a clear showing that the agent had managerial status or that the principal ordered or ratified the acts in question. *Barlow v. International*

---

7. According to I.C. § 28–2–328(3):
    "[an auction] sale is with reserve unless the goods are in explicit terms put up without reserve. In an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale. In an auction without reserve, after the auctioneer calls for bids on an article or lot, that article or lot cannot be withdrawn unless no bid is made within a reasonable time. In either case a bidder may retract his bid until the auctioneer's announcement of completion of the sale, but a bidder's retraction does not revive any previous bid."
    Thus if nothing had been said on the matter the sale would have been with reserve. In its brochure which was given to every buyer, Rouse also explicitly indicated that the sale was with reserve in these terms:
    "10. The auctioneers shall have the right to consolidate or break down lots, or to offer a complete facility as a single lot. Auctioneers reserve the right not to acknowledge or accept any bid which is merely a fractional advance over the preceding bid. The auctioneers retain the right, without notice, to withdraw any lot or lots, prior to the sale of said lot or lots."
    "12. Auctioneers reserve the right to withdraw any item prior to acceptance of bid."
    There can be no doubt, then, that this was a sale with reserve, and that Rouse could have assured that David's skidder did not sell below the stated minimum by withdrawing it at any time before completing its sale.

8. I.C. § 28–2–328(4) states:
    "(4) If the auctioneer knowingly receives a bid on the seller's behalf or the seller makes or procures such a bid, and notice has not been given that liberty for such bidding is reserved, the buyer may at his option avoid the sale or take the goods at the price of the last good faith bid prior to the completion of the sale. This subsection shall not apply to any bid at a forced sale. [1967, ch. 161, § 2–328, p. 351.]"

*Harvester Co.*, 95 Idaho 881, 898, 522 P.2d 1102, 1119 (1974); *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 905–6, 453 P.2d 551, 554–5 (1969); Restatement (2d) of Torts, § 909 (1979). The burden of making such a showing rests on the plaintiff, and in this case absolutely no evidence was offered to define the attorney's status. We decline to hold, as respondent suggests, that a corporate attorney has managerial status by definition.

In addition, as we note above, the acts alleged to justify an award of punitive damages must have damaged the plaintiff. Since the only legally cognizable loss David suffered was the monetary deficit in the sale price of his skidder, and since the issuance of the multiple-payee check with release statement in no way caused that loss, it clearly cannot be grounds for an award of punitive damages.[9]

We hold, therefore, that the district court erred in awarding punitive damages to David Hatfield based on the conduct of appellant Max Rouse & Sons, Northwest.

Thus, that part of the judgment awarding damages for breach of contract is affirmed; those portions of the judgment awarding damages for emotional distress and punitive damages are reversed and the cause is remanded to the district court with direction to enter judgment consistent with this opinion. No costs allowed.

DURTSCHI, LODGE, THOMAS and SWANSTROM, JJ. Pro Tem., concur.

---

**9.** See caveat set forth in *Linscott v. Rainier*, 100 Idaho 854, 606 P.2d 958 (1980), to the effect that this court does not approve the award of punitive damages in the ordinary breach of contract action, but only in the extreme case where outrageous conduct is alleged and proven.