MARCIA L. HASSING, APPELLEE, V. WILFERD W.
WORTMAN, APPELLANT.
333 N.W.2d 765

Filed April 29, 1983.   No. 82-039.

John R. Doyle, for appellant.

David W. Jorgensen of Nye, Hervert, Jorgensen & Watson, P.C., for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, and CAPORALE, JJ.

BOSLAUGH, J.

The plaintiff, Marcia Hassing, commenced this action to recover damages for severe emotional distress caused by outrageous conduct of the defendant, Wilferd W. Wortman. The jury returned a verdict in favor of the plaintiff in the amount of $18,120. The defendant has appealed.

The record shows that the parties were married in 1947 and were divorced in 1977. In July 1978 the plaintiff met George Hassing, whom she married in June 1979. The plaintiff alleged that certain of the actions of her ex-husband following the time she began to date Hassing caused her severe emotional distress. The behavior complained of ceased in October 1979.

The plaintiff testified that beginning in July 1978 Wortman began driving by her house 10 to 15 times a month. The drive-bys continued for a period of several months and increased, then diminished, in frequency. She stated that on one occasion she saw

Wortman crawling in the bushes outside her home. She also testified that on another occasion when she and George were out on a date Wortman attempted to force their car over to the side of the road. On another occasion Wortman entered her home through an unlocked door, after receiving no response to the doorbell. The plaintiff then called the police and the defendant was arrested.

Wortman had an investigation made of George Hassing and visited his two ex-wives. He visited the plaintiff at her place of employment, a grade school, to tell her what he had learned. Wortman mailed her a letter he received from the investigating service which contained information about Hassing's car registrations and driver's license.

Wortman testified that he sent out a Christmas letter to relatives which summarized his marriage and divorce from the plaintiff. In that letter he indicated that the plaintiff was pregnant when they married and implied that he may not have been the father. Wortman also wrote letters to the plaintiff about an inheritance of Hassing's and Hassing's liability to his ex-wives. Wortman further wrote to the plaintiff's supervisor regarding her relationship with Hassing and revealed some of the information about Hassing which Wortman had obtained. Wortman sent the plaintiff another letter indicating that he knew certain intimate details about her relationship with Hassing. Wortman prepared yet another letter entitled "Meet George Walter Hassing, Jr.," which contained information about George Hassing. Wortman gave copies of this letter to some of the neighbors of the plaintiff.

Wortman approached two members of the local school board about a plan whereby the plaintiff would learn that the board might not renew her teaching contract. Wortman felt that such knowledge would dissuade George Hassing from continuing his relationship with the plaintiff. Both men refused to participate.

The plaintiff testified that she had a security guard at her wedding in June 1979, and that she was afraid of Wortman. She testified that she had consulted a psychiatrist on two occasions but stopped going, as she decided to "handle this on my own." The charge for the visits amounted to $120. The plaintiff testified that the actions of Wortman embarrassed and humiliated her, and caused her to worry and lose sleep.

The evidence shows that the street on which Marcia Hassing lived is on a route which Wortman could take on his way to and from work. The plaintiff testified that the things Wortman found out about George Hassing through the investigations were true and that she had known about them, and that none of Wortman's actions placed her job in jeopardy. Wortman testified that the family members to whom he sent the Christmas letter knew about Marcia's premarital pregnancy.

Wortman testified that after his 1977 divorce from the plaintiff they attempted a reconciliation and that they had, at one point, planned to remarry. Wortman testified that he did not intend to cause the plaintiff to suffer mental anguish.

Wortman contends that a verdict should have been directed in his favor because his conduct did not amount to the extreme and outrageous conduct required for this tort.

In order to recover the plaintiff must show that the extreme and outrageous conduct of the defendant intentionally or recklessly caused her to suffer severe emotional distress. *Paasch v. Brown*, 193 Neb. 368, 227 N.W.2d 402 (1975); *Davis v. Texaco, Inc.*, 210 Neb. 67, 313 N.W.2d 221 (1981); Restatement (Second) of Torts § 46 (1965).

In describing what constitutes extreme and outrageous conduct, this court has said: "Liability has been found only where the conduct has been so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be

regarded as atrocious and utterly intolerable in a civilized community. There is no occasion for the law to intervene in every case where some one's feelings are hurt. A defendant is never liable where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." *Paasch v. Brown, supra* at 370, 227 N.W.2d at 404 (language from the Comment to § 46 of the Restatement).

In *Davis v. Texaco, Inc., supra*, we said: " 'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities . . . .' " (quoting Comment d to § 46 of the Restatement). In that case we also said that "the conduct necessary to support such a claim [must exceed] 'that which a reasonable person could be expected to endure.' " *Id.* at 70, 313 N.W.2d at 223 (quoting *Meyer v. Nottger*, 241 N.W.2d 911 (Iowa 1976)).

Examples of such behavior can be found in W. Prosser, Law of Torts, *Infliction of Mental Distress* § 12 (4th ed. 1971). Among them are threatening a schoolgirl with prison and public disgrace unless she signs a confession of immoral misconduct; mishandling or mutilation of corpses; and various repeated and high-pressure tactics by collection agencies. See, e.g., *LaSalle Extension University v. Fogarty*, 126 Neb. 457, 253 N.W. 424 (1934) (collection tactics).

It is doubtful whether the defendant's actions in this case amounted to extreme and outrageous conduct. He did not threaten the plaintiff's safety in any way. The information about Hassing which was revealed to the plaintiff was known to her. He revealed her premarital pregnancy only to relatives who already knew of the situation. His actions did not cause her distress at the prospect of losing her job. That he drove by her house frequently is not alone an intentional, outrageous act. While the de-

fendant acted in a childish, irresponsible, and inconsiderate fashion, it is doubtful whether his conduct constituted a sufficient basis upon which liability could be imposed, on the plaintiff's theory of the case.

For cases holding that there was no outrageous conduct sufficient to warrant liability, see, *Paasch v. Brown, supra; Davis v. Texaco, Inc., supra; American Road Serv. Co. v. Inmon,* 394 So. 2d 361 (Ala. 1981); *Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 619 P.2d 1032 (1980).

Before the plaintiff could recover she was required to prove that she had suffered "an extreme disabling emotional response." *Davis v. Texaco, Inc., supra* (quoting *Anderson v. Continental Ins. Co.,* 85 Wis. 2d 675, 271 N.W.2d 368 (1978)). The distress must have been so severe that no reasonable person could have been expected to endure it. *Davis v. Texaco, Inc., supra.* In *Freedom Homes of Texas, Inc. v. Dickinson,* 598 S.W.2d 714, 718 (Tex. Civ. App. 1980), the court said, "In order to recover for mental anguish, it is necessary to show something more than mere worry, anxiety, vexation or anger . . . ."

In a recent decision the Minnesota Supreme Court emphasized the extreme degree of mental distress which a plaintiff must suffer before the conduct becomes actionable. In *Hubbard v. United Press Intern., Inc.,* 330 N.W.2d 428, 439 (Minn. 1983), the court said: "In explaining both the extreme nature of the conduct necessary to invoke this tort, and the necessary degree of severity of the consequent mental distress, the Restatement's commentary emphasizes the limited scope of this cause of action, and clearly reflects a strong policy to prevent fictitious and speculative claims. Because this policy has long been a central feature of Minnesota law on the availability of damages for mental distress, our adoption of the Restatement formulation as the standard for the independent tort of intentional in-

fliction of emotional distress does not signal an appreciable expansion in the scope of conduct actionable under this theory of recovery. The operation of this tort is sharply limited to cases involving particularly egregious facts."

The court further stated at 440: "Similarly, the primary evidence of Hubbard's emotional distress was his own testimony that 'because of' UPI's conduct he 'had been depressed,' that he had become 'physically ill in terms of throwing up, and had stomach disorders,' and that he had developed a skin rash and high blood pressure. Despite this testimony about his problems, Hubbard never missed work, never filed a claim for workers' compensation, and never saw a doctor until June 1980, and went then only because he had the flu. Medical evidence as to Hubbard's injuries is conspicuously absent from the record. The extent of the 'injury' proven by this record does not exceed that of any employee who experiences an employer's criticism or reproof concerning job performance. Accordingly, the jury should not have been permitted to find that the distress was so severe that no reasonable person could be expected to endure it. Restatement (Second) of Torts § 46 comment j (1965)." In footnote 9 at 440, the court further stated: "We have previously noted the need for trial courts to carefully scrutinize evidence presented by plaintiffs in support of their claims regarding the cause and the severity of alleged emotional distress absent a contemporaneous physical injury. In *Johnson v. Sampson*, 167 Minn. 203, 208 N.W. 814 (1926), we emphasized that: '[T]here is always a possibility of trumped-up claims if there may be a recovery where no evidence of bodily injury can be discovered immediately. However, the matter is in the control of the trial courts, and verdicts for plaintiffs for any substantial amounts, when based chiefly on proof of subjective symptoms, will not usually be al-

lowed to stand. 167 Minn. at 207, 208 N.W. at 816.' ''

In *Fletcher v. Western National Life Ins. Co.*, 10 Cal. App. 3d 376, 397, 89 Cal. Rptr. 78, 90 (1970), the court stated, ''Severe emotional distress means, then, emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it.'' Plaintiff, disabled father of eight, had been badgered into a compromise agreement regarding his disability payments. The court found his distress was severe.

''Emotional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry. However, it is only when emotional distress is extreme that possible liability arises.'' *Roberts v. Saylor*, 230 Kan. 289, 294, 637 P.2d 1175, 1180 (1981). In the *Roberts* case the plaintiff had brought suit for malpractice. That action was settled. The plaintiff subsequently required further surgery, to be performed by a different doctor. As she was being prepared for that surgery the doctor whom she had sued entered the room and said in a hostile voice, '' 'I don't like you, I don't like you . . . I wanted to tell you that before you went in there.' '' The plaintiff then sued the doctor for intentional infliction of emotional distress.

In evaluating plaintiff's emotional distress, the court said: ''Next we will consider the second threshold question. Was the emotional distress evidenced by plaintiff such that reasonable fact finders might differ as to whether it was genuine and so severe and extreme that no reasonable person should be expected to endure it?

''Plaintiff's deposition testimony as to the nature and extent of her emotional distress was as follows:

'' 'Q. Well, what other damages, or what is it that you're claiming by way of damages in this case;

how have you been injured or damaged by what occurred that day?

" 'A. Because I'm upset about it; I'm still upset. I was upset then and I'm still upset.

" 'Q. Well, is that all?

" 'A. When I seen him down there I was afraid that maybe he would come in there and try to do something to me, I didn't know.

" 'Q. You were going to sue him anyway?

" 'A. No, no, no, no.

" 'Q. Well, other than being upset, you were already upset before he ever said this. Is there anything else?

" 'A. Upset before?

" 'Q. You said you were always upset about this, and you were upset before he came in, isn't that right?

" 'A. I just got partially calmed down from what he said to me the time before, and then he came back again and started harassing me again this last time.

" 'Q. Well, my question is, in what way do you claim that you've been injured or damaged by what occurred while you were in the hospital on that day, January of this year?

" 'A. I'm nervous from all of it. I don't know what kind of damage you're talking about.

" 'Q. I'm trying to find out—I'm not talking about any, I'm trying to find out—

" 'A. Didn't do no bodily harm to me.'

"Then on cross-examination by her own attorney plaintiff testified that as a result of defendant's conduct she was scared and didn't want to go into surgery.

"The surgery was performed successfully. Although she expressed a continuing concern and nervousness resulting from the incident, such was the total extent of her emotional distress. There is no indication that psychiatric or further medical treat-

ment or medications were necessary or that she was unable to function in a normal way thereafter.

"After a careful review of the entire record it is apparent that plaintiff's emotional distress resulting from the incident was not so severe that no reasonable person should be expected to endure it. There can be little doubt that plaintiff did express fright, embarrassment and worry but this appears of the nature which is not actionable. The emotional distress suffered by her was resentment and upset which normally results from acts and criticism which are inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt.

"Accordingly we hold that neither threshold requirement was shown to have been met and summary judgment in favor of defendant was proper." *Id.* at 295-97, 637 P.2d at 1181.

In *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 155 (Me. 1979), the court said: "In the instant case, the presiding justice set aside the jury's verdict awarding plaintiff $5,000 in compensatory damages for mental suffering on grounds that '[t]here was no evidence of severe or substantial mental suffering, no evidence of objective symptomatology.' A careful review of the record compels agreement with the presiding justice's conclusion. The sole evidence of plaintiff's emotional distress was his own testimony that he felt 'kind of down' and 'mad' and 'nervous for about a month.' As a matter of law that evidence could not support a verdict for plaintiff on a theory of negligent infliction of mental distress, since Vicnire suffered no illness or bodily harm (*i.e.*, no objective symptomatology) as a result of his alleged distress. Even were the jury to conclude that defendant by extreme and outrageous conduct intentionally or recklessly inflicted mental distress upon Vicnire, there is no evidence that his alleged mental distress rose to that degree of severity that is required by the law to justify imposing liability upon

defendant. This jury heard no evidence from which it could conclude that plaintiff's mental distress was so 'severe' that 'no reasonable man could be expected to endure it.' In short, the presiding justice's order setting aside the jury's verdict of $5,000 in compensatory damages for emotional distress was entirely proper.''

In *Poulsen v. Russell*, 300 N.W.2d 289, 297 (Iowa 1981), the court said: "On the facts of this case, we conclude that Poulsen has failed to present substantial evidence of severe and extreme emotional distress upon which a reasonable trier of fact could conclude that he had established this element. Our prior cases indicate that the plaintiff must present more evidence than that he felt bad for a month. *E.g., Meyer*, 241 N.W.2d at 915-16 (sufficient evidence to go before jury where plaintiff was nauseous, had difficulty breathing, and suffered acute myocardio ischemia); *Northrup*, 204 N.W.2d at 855 (substantial evidence of distress where plaintiff cried, lost weight, suffered abdominal cramps); *Blakeley v. Shortal's Estate*, 236 Iowa 787, 20 N.W.2d 28 (1945) (plaintiff had difficulty sleeping, was nervous, restless, and did not return to scene of tort for some time).

"The only evidence Poulsen presented was about his distress at the ending of the relationship. There is no evidence of any distress during the deterioration of the relationship. While he was understandably upset over selling out to Russell, he has not presented substantial evidence of severe emotional distress. *See Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 155 (Me. 1979) (plaintiff's testimony that he felt 'kind of down,' 'mad,' and 'nervous for about a month' not substantial evidence of severe emotional distress); *Harris v. Jones*, 281 Md. 560, 572, 380 A.2d 611, 617, 86 A.L.R.3d 441, 453 (1977) (testimony that plaintiff was 'shaken up' and felt 'like going into a hole and hide' not sufficient). For most members of the community, especially those engaged in life in

the commercial world, 'a certain toughening of the mental hide is better protection than the law could ever be.' Margruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv. L. Rev. 1033, 1035 (1936). *See Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 850, 606 P.2d 944, 954 (1980)."

The plaintiff in this case testified that she was "embarrassed and humiliated" by the defendant's conduct. She further testified: "Q Other than this particular embarrassment and humiliation from the disclosure of this, was there any other feelings — emotional problems that you may have had from the publication of these letters? A Well, I have worried a great deal about it. Q What do you mean worried, Mrs. Hassing? A It has kept me awake. . . .

. . . .
"Q Does it affect your life, Mrs. Hassing? A Yes. Q Happen on a day-to-day basis? A Yes. Q Tell us how that affects your life. A It makes me nervous. It makes me cry. I feel badly.

. . . .
"Q Tell the jury how these acts have affected you other than what you've just testified. A They make me very angry. Q What do you mean by being angry? A I'm angry that my past history has been told. Q Other than anger, do you have any other feelings that have come from these acts? A I have fear. Q Fear of what? A Fear of retaliation.

. . . .
"Q Do you have any difficulties as a result of these acts that have been testified to, any other physical aspects of your life? A I have sleepless nights. I am always looking out the window at night when I get up. I am worried whenever I hear noises that I'm not familiar with. I'm concerned about the surveillance.

. . . .
"A I have had emotional distress at the time

these letters came and other letters, all of these things because it created a problem in my marriage. Q With who? A With my husband. Q When these things would come, would it cause difficult problems with you and Mr. Hassing? A Yes, it would. Q Cause arguments? A Yes, it would cause arguments, hard feelings, misunderstandings, tension."

Plaintiff further testified on cross-examination: "Q Mrs. Hassing, have you undergone any medical treatment since July 14, 1978? A Yes. Q And with whom? A Dr. Murray. Q How many times did you see Dr. Murray? A Twice. Q Did he dismiss you then? A No.

. . . .

"Q Why haven't you gone back if he didn't dismiss you? A I decided I was going to have to handle this on my own. Q Have you handled it on your own? A Yes. Q Without the help of Dr. Murray? A Yes. Q What kind of doctor is Dr. Murray? A Psychiatrist.

. . . .

"Q Have you sought any other medical treatment since July of 1978? A No. Q How many days of school did you miss last year? A Five. Q What was the occasion of those? A Colds, flu. Q And the year before? A The same. Q Five days? A I expect; I don't know for sure. I'm guessing. Q But because of colds and flu? A Yes."

The record in this case fails to show the extreme emotional distress for which recovery may be had in this type of action. The absence of any medical testimony in this case and the absence of any evidence that the plaintiff's job performance was adversely affected is of some significance. The plaintiff failed to prove that she had suffered emotional distress so severe that no reasonable person could have been expected to endure it. *Davis v. Texaco, Inc., supra.*

It is unnecessary to consider the other assignments of error.

The judgment of the District Court is reversed and the cause remanded with directions to dismiss the petition.

REVERSED AND REMANDED
WITH DIRECTIONS.

WHITE, J., dissenting.

Among the most treasured of the rights a citizen possesses is the right to privacy, the right to be left alone. The accidental intrusions on one's right to be left alone necessitated by the complications of an urbanized society are burden enough to bear by any reasonably sensitive person. The deliberate harassing intrusions, repeated frequently and for a continued period, are savage, uncivilized, and outrageous. I reject outright the conclusion that the conduct here is not sufficiently horrid to be classified as outrageous. The law must and should provide protection from this absurd conduct and not be seen to stand helplessly by, wringing its hands. Often the most effective method of teaching good manners is the money judgment.

I also reject the implication that recovery cannot be had in the absence of expert testimony by mental health personnel. The ability to withstand outrageous conduct, that might in another person cause physical and mental collapse, ought not to be a reason to bar recovery. The conduct is the same; the mental and physical conditions of the victims may vary. The conclusion that expert evidence of disability is required is not supported by *LaSalle Extension University v. Fogarty*, 126 Neb. 457, 253 N.W. 424 (1934).

The jury was properly instructed. I would leave its decision, that the plaintiff suffered severe emotional distress, undisturbed and affirm this judgment.

KRIVOSHA, C.J., joins in this dissent.