(No. 6830.    October 25, 1941)

JOHN KLAM, Respondent, v. HARRY KOPPEL, Appellant.

(118 Pac. (2d) 729)

Rehearing denied November 22, 1941

Ariel L. Crowley and Willis C. Moffatt, for Appellant.

Frawley & Barnes, for Respondent.

HOLDEN, J.—Respondent John Klam owns a ranch on the bench near the mouth of Grimes Creek in Boise County, where he has resided for about 34 years. In addition to the ranch he operates a small sawmill on More's Creek. November 4, 1935, Klam purchased a used Cleveland Cletrac 12-20 tractor for use on the ranch and in his sawmill, paying therefor the sum of $100.00. Before taking the tractor to his ranch he had it overhauled by the Sawtooth Company at a cost of $128.85. Later, on the ranch, he and his son made certain changes in the gears and installed new bearings at an additional cost of $37.00. Klam also installed another motor. He used the tractor on his ranch harrowing, haying, road building, pulling logs and rocks, and so on. At one time he lent it to a neighbor to pump water, for which the neighbor, a former tractor assembly man, did some additional work on it. In the spring of 1939, Klam and son removed the motor, radiator spring, frame supports and angle irons, and took them to his sawmill to supply power for sawing wood, leaving the tractor standing on his property in a field.

It appears that one Philip Gums had gathered scrap-iron from an area around Idaho City and sold it to the Idaho Junk House located in Boise, and that upon bringing in his second load from that area, October 12, 1939, notified Harry Koppel, appellant, he could find no more scrap-iron. Koppel then drew Gums a diagram indicating the approximate location of the tractor. By following the map Gums located the tractor and the next day, October 13, 1939, took the tractor apart—taking some of the bolts out and smashing the remainder to pieces with a sledge hammer. He then loaded it into a trailer, drove to Boise, weighed at the City Scales, and took to a loading platform what he had converted into scrap-iron by

vigorous use of a sledge hammer. He then took the weigh slip to the office of the Idaho Junk House and received a check signed by Simon Koppel for something over $8.00.

Klam's son discovered the loss October 13. Klam then notified the deputy sheriff of Boise County and they proceeded to Boise to locate the missing tractor. At the Idaho Junk House loading platform they found and identified three pieces which had been taken, loaded in a freight car, under a quantity of other scrap-iron. Koppel was requested to unload these pieces and refused, stating that Klam had better unload them himself as the car was moving to Portland the next day. An Ada County deputy sheriff was called to the scene and he ordered Koppel to unload the pieces so found and identified. The following day Klam's son identified other portions of the tractor and they were also unloaded from the car—all being cracked, sprung or broken. Gums was arrested October 14, 1939, and taken to Idaho City. There Klam swore out a complaint charging him with petty larceny (theft of property not exceeding the value of $60). Gums pleaded guilty and was sentenced to ten days in the county jail. Upon serving his sentence he mailed the diagram given him by Koppel to the attorneys for Klam. December 1, 1939, respondent filed a complaint in trover against appellant for the conversion of the tractor, valued at $250, without the engine, and also sought $500 punitive damages. Appellant demurred and moved to strike the allegations of the complaint relative to punitive damages. The demurrer was overruled and the motion to strike denied, whereupon appellant answered denying he took or converted the tractor. The case was tried to a jury commencing March 20, 1940. It returned a verdict for the sum of $250 damages and $290.50 exemplary damages. Judgment was accordingly entered. Appellant then moved for a new trial which was denied. Koppel appeals from the order denying his motion for a new trial as well as from the judgment.

While many contentions are made, these seem to be particularly stressed: (1) That where it is alleged the whole of a machine was converted, and the proof shows

only a part of it was converted, no recovery can be had unless the proof shows the value of the parts actually taken. In support of this contention appellant relies principally upon *McGuire v. Post Falls Lumber & Manufacturing Co.*, 23 Idaho 608, 131 P. 654, and *New York Central Railroad Co. v. Buckley Rubber Co.*, 99 Ind. App. 191, 187 N. E. 353.

In the first case it appears McGuire had a ditch about 1800 feet long taking water out of Pritchard Creek and dropping it into a pond near his mill, from which pond the water was carried by means of a flume a distance of 560 feet to the mill. During the high water period of 1910 the Post Falls Lumber & Manufacturing Company commenced floating large quantities of logs down the stream. The logs piled up and formed a jam in the channel opposite, and diverted the main stream onto McGuire's property, filling up the ditch and washing the flume away, and generally damaging his property. McGuire brought an action to recover damages and obtained a judgment for $2250. Discussing the measure of damages the court said:

"Considerable has also been said in this case touching the measure of damages to be adopted in such cases. We see no reason why the rule applicable in cases of damage to real estate should not apply in cases of personal property or fixtures. Where the property is totally destroyed or so badly injured and impaired as to render it valueless for the use to which it was originally designed and appropriated, the measure of damages should be the value of the property at the time of its destruction. Where, however, the property is merely damaged and is capable of being repaired, the measure of damage should be the cost of repair together with the value of the use of the property during the time that it would take to repair it."

In the case at bar Gums, called by respondent, testified on direct examination:

Q. "How did you take it apart? How was it fastened?

A. Well, it was fastened with bolts, and I took some of the bolts out; and then I had a sledge hammer with me, and I smashed some of it to pieces with the sledge hammer."

On cross-examination he testified:

Q. ". . . And you say you then took the tractor apart and loaded it on your trailer?

A. Yes, sir.

Q. And how long did that take you?

A. Oh, I would estimate about an hour, maybe less, I broke a lot of it up with a sledge hammer.

Q. You did what?

A. I broke a lot of it up with a sledge hammer.

Q. Oh, you broke a lot of it up with a sledge hammer?

A. Yes, sir.

Q. And you put it in your trailer?

A. Yes, sir."

To meet respondent's evidence that the tractor had been destroyed or so badly injured and impaired as to render it valueless for the use for which it was designed, appellant put Cecil Grow on the stand. He testified that he was foreman of the Sawtooth Company; that the company repaired the tractor in question and that he worked on the job some himself; that a couple of days before the case was tried he saw some of the parts and pieces taken by Gums; that some were bent from use "or could have been bent mechanically"—he could not say which; that when asked whether or not the parts could be taken and assembled into a tractor, he answered "I would hate to take the job myself."

The issue being submitted to the jury as to whether the tractor had been destroyed or so badly injured and impaired as to render it valueless for the use for which it was originally designed, as contended by respondent, or whether it had been merely damaged and therefore "capable of being repaired," as insisted by appellant, the jury found the issue in favor of respondent.

In the second case relied upon it appears the Buckley Rubber Company shipped a "knocked-down" calender weighing about 28 tons, from Springfield, Illinois, to Auburn, Indiana. When the car in which it was shipped reached its destination, it was placed on a "team track" near the plant of the company. After the calender was unloaded the rubber company caused most of the parts to be placed in its plant adjacent to the railroad right of

way, but left upon the right of way five pieces or parts. These parts remained on the right of way from November 7, 1926, to August 25, 1928, at which time they were removed by a junk dealer to whom the railroad gave the parts if the junk dealer would bear the expense of removal. The complaint alleged that there was a conversion of the entire calender. The court said:

"There is a complete failure to prove the conversion of the entire calender, and the uncontradicted evidence establishes that only five parts were taken; that each of these parts could have been replaced by purchase of similar parts; that each separate part had a market value at Auburn, Ind., on the day of the alleged conversion."

This case is clearly not in point in that and as the court points out there was "a complete failure to prove the conversion of the entire calender." Had the evidence shown there, as in the case at bar, that some of it, for instance, the framework of the calender, had been "smashed" or that someone had broken "a lot of it up with a sledge hammer," and thus so badly injured and impaired the calender as to render it valueless for the use for which it was originally designed, an entirely different case would have been presented to that court, necessitating a different conclusion.

In *Nalley. v. Thomason et al.* (Georgia Court of Appeals), 113 S. E. 65, it was held:

"Where there is an unauthorized removal and appropriation to one's own use of any of the substantial and essential parts of an entire chattel, such conversion will, if the chattel be a complicated mechanism constructed to perform certain work, amount to a conversion of the whole, if the removal of such parts so impairs the chattel as to destroy its character as a whole and defeat its intended use."

And this court in *Schlieff v. Bistline*, 52 Idaho 353, 357, 15 P. 2d 726, held:

"Conversion in any distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein, such as a tortious taking of another's chattels, or any wrongful exercise or assumption of authority, personally or by procurement,

over another's goods, depriving him of the possession, permanently or for an indefinite time."

To the same effect: *Carver v. Ketchum*, 53 Idaho 595, 601, 26 P. 2d 139.

(2) It is contended "there is no evidence to establish any agency on the part of Gums for Koppel in the taking of the parts which Gums stole."

The Supreme Court of Alabama in *Geneva Gin & Storage Co. v. Rawls et al.*, 199 So. 734, 735, held:

"Both the thief, Donnell, and the purchaser were guilty of a conversion of plaintiff's property [3 bales of lint cotton] and were liable in an action of trover to the owner, plaintiff."

and that:

"When the thief, Donnell, sold and delivered the property to the purchaser Rawls, and the latter received and undertook to assume dominion over the same, both became joint tort-feasors, and both liable jointly in an action of trover and conversion, and this, too, without regard to whether Rawls had prior knowledge of the fact that Donnell had stolen the property."

Here the evidence very convincingly shows a taking and purchase of the property in question. Hence, both the thief and the purchaser became joint tort-feasors and "both liable jointly in an action of trover and conversion, and this, too, without regard to" whether appellant had prior knowledge of the fact that the property had been stolen. Furthermore, and as this court held in *Federal Land Bank v. McCloud*, 52 Idaho 694, 703, 20 P. 2d 201:

"One who buys property must, at his peril, ascertain the ownership; and if he buys of one having no authority to sell, his taking possession in denial of the owner's right is a conversion."

(3) It is contended "clear proof of wanton or malicious, gross, outrageous or other intolerable, fraudulent, malicious or oppressive conduct is a mandatory prerequisite to allowance of punitive damages."

We held in *Unfried v. Libert*, 20 Idaho 708, 728-9, 119 P. 885 (followed and approved in *Gunnell v. Largilliere Company, Bankers*, 46 Idaho 551, 559, 269 P. 412):

"As we understand the rule of exemplary or punitive

damages, they cannot be recovered unless the evidence shows clearly that the action of the wrongdoer is wanton, malicious or gross and outrageous, or where the facts are such as to imply malice and oppression, in which case the law authorizes the court to allow a sum of money as punishment to the wrongdoer for the injury done."

And continuing:

"We think the general rule recognized by the weight of authority is, that exemplary or plenary damages may be allowed where the injury complained of is attended by acts of the wrongdoer which show wilful malice, fraud or gross negligence. The evidence, however, must show the malice and negligence, *or facts from which the same may be inferred*." (Italics ours.)

Does the evidence in the case at bar show the acts and conduct of the joint tort-feasors (appellant and Gums) were wanton, malicious, or gross and outrageous, or are the facts such that malice and fraud may be inferred? As hereinbefore pointed out, Gums testified, and his testimony is not contradicted, that when he went to take the tractor he took a sledge hammer with him, and it appears that instead of taking the tractor apart without doing any injury to the parts being removed, as, of course, could have been easily done absent wilful and malicious intent to destroy, Gums deliberately "smashed some of it to pieces" and "broke a lot of it up with a sledge hammer." It would be difficult to conceive more deliberate, wanton and malicious conduct than that; which, taken together with other facts and circumstances in the case, for instance, stealing the property early in the morning, hauling it to Boise, and in the forenoon of the same day loading the stolen parts in the bottom of a car of scrap-iron to be moved the next morning (pointing rather clearly to an intent to defraud), supports the verdict of the jury awarding exemplary damages.

█ (4) It is contended "the evidence affirmatively shows that Harry Koppel is not the owner of the business institution to which Gums sold the stolen parts but only one of three partners interested in it," apparently thereby contending there is a defect of parties. Section 52-313, I. C. A., of the Uniform Partnership Law provides:

"Partnership bound by partner's wrongful act.—Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."

And Section 52-315, I. C. A., provides:

"Nature of partner's liability.—All partners are liable:

1. Jointly and severally for everything chargeable to the partnership under Sections 52-313 [the section pertinent here] and 52-314.

2. . . . . "

Under Section 52-315, supra, respondent had a choice of remedies. He could sue the copartners jointly, or any member of the copartnership individually.

■ (5) It is contended the court erred in overruling the demurrer "for the reason that the complaint fails to state facts sufficient to constitute a cause of action, in that the complaint fails to allege a demand upon the defendant for the property alleged to be converted."

While the case involved the statute of limitations, this court held in *School District No. 18 v. Twin Falls B. & T. Co.*, 52 Idaho 200, 207, 12 P. 2d 774 (a conversion case), that:

"If the taking was originally wrongful [as in the case at bar], no demand is necessary before bringing suit. If the original possession is rightful, then a demand is required."

Maxwell on Code Pleading:

"If the defendant came lawfully into the possession of the goods, a demand, in many cases, must be made upon him to make him a wrongdoer, but such demand need not be alleged unless, from the petition itself, it should appear that the defendant came lawfully into possession." (p. 326.)

"If, however, the defendant came into the possession of the property wrongfully, or through someone who had no right or title, a demand is unnecessary." (p. 533.)

And in Chitty on Pleadings (16th Am. Ed., Vol. 1, p. 173, 224) :

"In the case of a conversion by wrongful taking, it is not necessary to prove a demand and refusal, and the intent of the party is immaterial."

(6) It is contended "the complaint fails to state facts sufficient to disclose malice, oppression, wantonness, etc., warranting punitive damages." In *Dwyer v. Libert,* 30 Idaho 576, 586, 167 P. 651, we quoted with approval the following from *Stark v. Epler,* 59 Ore. 262, 117 P. 276:

"The rules of pleading do not require that the allegation relating to exemplary damages should be set out separately from the other averments of the complaint. Special damages must be grounded upon separate allegations, but exemplary damages are so intimately connected with general damages that if the general allegations are sufficient to show the wrong complained of was inflicted with malice or oppression or other like circumstances, the complaint will be sufficient to authorize the infliction of punitive or exemplary damages."

We then held:

"It is not necessary to the recovery of exemplary damages that they should be specially claimed in the complaint, but such damages may be recovered under a claim for damages generally."

(7) It is contended the evidence is insufficient to support the verdict for certain reasons, among them, (a) that the evidence fails to show a taking of the complete tractor; (b) that respondent "made no effort to prove the value of the frame, the radiator, the springs, the seat, the axles, the power take-off, the sprocket wheel nor any other part of the tractor which was not taken" and (c) that "there is no evidence indicating or fixing the value of the parts taken by Gums and delivered to Idaho Junk House."

This action was not prosecuted for the purpose of recovering the value of the particular parts "smashed to pieces," taken and converted, but for the destruction of the tractor as a whole; that is to say, the complaint was bottomed upon the charge that the entire tractor was

taken and converted in that it was so badly injured and impaired as to render it valueless for the use for which it was originally designed, and as the jury evidently found. Hence, to recover, it was not necessary to prove the value of any of the parts taken and converted.

(8) It is contended the court erred in giving Instruction No. 9 "for the reason that the said instruction allows recovery as damages of the 'reasonable worth and value of such property as is shown by the evidence.' By such instruction the court omitted to charge that the only value recoverable was the market value, and injected the element of 'worth,' thus going beyond actual market value and into the conjectural realm of personal feeling and use, in violation of the rule of market value declared by this court."

Where, as here, there was no market value at the time when and place where the tractor was converted, the owner is a competent witness as to its reasonable value. (*Garrett v. Neitzel*, 48 Idaho 727, 731, 285 P. 472; *Rankin v. Caldwell*, 15 Idaho 629, 99 P. 108; *Keller v. Sproat*, 35 Idaho 273, 205 P. 894; *Wicklund v. Allraum*, 122 Wash. 546, 211 P. 760.)

(9) It is contended "the court erred in giving instruction No. 5 for the reason that the same is self-contradictory; it erroneously defines 'trover' as a *cause of action*, instead of the form of remedy; it is confusing, prolix, and in its attempt to paraphrase the first paragraph, erroneously applies the doctrine of *Schlieff v. Bistline*, 52 Idaho 353, by making conversion and trover synonymous, and omitting the essential element 'not every asportation of the property of another will authorize recovery as for an unlawful conversion.' "

By the first paragraph of the instruction the court instructed "Trover is the technical name of the action [form of remedy] to recover damages for a wrongful conversion of the property of another." The second paragraph of the instruction follows the language employed in *Schlieff v. Bistline, supra.* Furthermore, if appellant had desired an instruction that "not every asportation of the property of another will authorize recovery as for an unlawful conversion" it was his duty to present such an

instruction to the trial court. (*Lessman v. Anschustigui,* 37 Idaho 127, 133, 215 P. 460; *Joyce Bros. v. Stanfield,* 33 Idaho 68, 71, 189 P. 1104; *Boomer v. Isley,* 49 Idaho 666, 674, 290 P. 405; *Evans v. Davidson,* 58 Idaho 600, 615, 77 P. 2d 661; *Owen v. Taylor* 62 Idaho 408; see also: *Tyson Creek R. R. Co. v. Empire Mill Co.,* 31 Idaho 580, 174 P. 1004; *French v. Tebben,* 53 Idaho 701, 27 P. 2d 475.)

(10) It is contended "the court erred in giving instruction No. 8 for the reason that the said instruction omits the essential element 'in denial of the owner's right,' required by the decision from which the instruction was inaccurately copied." By instruction No. 5 the court instructed:

"A conversion, in the sense of the law of trover, consists either in the appropriation of the thing to the party's own use and beneficial enjoyment, or in its destruction, or in exercising dominion over it, *in exclusion or defiance of the plaintiff's* [owner's] *right, or in withholding possession from the plaintiff, under a claim of title, inconsistent with his own."* (Italics ours.)

This court has repeatedly held instructions must be read as a whole, and the court so instructed the jury.

Many contentions are made in addition to those discussed. We find, upon a careful and thorough examination, they are without merit. Finding no prejudicial error, it follows the judgment must be affirmed, and it is so ordered, with costs to respondent.

Morgan, J., and Buckner, D.J., concur.

Givens, J., deeming himself disqualified, did not sit at the hearing or participate in the decision.

AILSHIE, J., (dissenting in part)—I concur in affirming the judgment for compensatory damages. I think the evidence is abundant to support the verdict for conversion of the tractor as a whole.

I am unable, however, to agree to the affirmance of the judgment for punitive damages. This, in my judgment, is not such a case as comes within the rule. We have no statute in this state authorizing the imposition of punitive or exemplary damages. The principle, in so far as it exists here, comes from our adoption of the

common law. It is allowed in the nature of a punishment to the defendant and a warning and example to deter others from committing like offenses.

"Exemplary damages are not a favorite of the law, and it has been said that the power of giving them should be exercised with great caution and that they are properly confined within the narrowest limits."

(15 Am. Juris, p. 704, sec. 268; *Post v. Buck's Stove & R. Co.,* 43 L. R. A., N. S., 498, 501; *Yesel v. Watson,* 226 N. W. 624, 64 A. L. R. 929.)

We have, however, recognized and adopted the principle of allowance of punitive and exemplary damages in certain cases. In *Unfried v. Libert,* 20 Idaho 708, 728, 119 Pac. 885, 891, we announced the rule for allowance of such damages as follows:

"As we understand the rule of exemplary or punitive damages, they cannot be recovered unless the evidence shows clearly that the action of the wrongdoer is wanton, malicious or gross and outrageous, or where the facts are such as to imply malice and oppression, in which case the law authorizes the court to allow a sum of money as punishment to the wrongdoer for the injury done."

That rule has been subsequently cited and approved. *Dwyer v. Libert,* 30 Idaho 576, 167 Pac. 651; *Gunnell v. Largilliere Co.,* 46 Idaho 551, 559, 269 Pac. 412.

The chief difficulty arises in applying this rule to the facts of any given case. In the first place, the query arises as to whether the "wanton, malicious or gross and outrageous" conduct may be general, or whether it must be directed toward the plaintiff who is seeking the damages and "imply malice and oppression" *toward the plaintiff.* The authorities, which have considered this aspect of the question, seem to have adopted the latter view; that is, that the malice and wrongful conduct must have been directed at the plaintiff and been intended to annoy, oppress, humiliate, or otherwise injure *the plaintiff.*

Most of the cases, discussing the circumstances under which punitive or exemplary damages may be allowed, refer to and discuss mental anguish, humiliation, personal indignities, and civil wrongs and injuries pertaining to

the person of the plaintiff. Some of the cases make a distinction between those civil actions which arise out of the commission of crimes and those which are merely tortious. 98 A. L. R., p. 267, note; 15 Am. Juris., p. 711, sec. 275, notes 10 and 11; *Pixley v. Catey*, 102 Ind. App. 213, 1 N. E. 2d 658; note to *Vaughn v. Mesch*, 123 A. L. R. 1115.

Some courts have refused to make any distinction between the two, while other courts have refused to allow punitive damages in civil actions, where the offense carried the penalty of fine or imprisonment. In discussing this subject, 2 Sutherland Damages, 4th ed., sec. 402, pp. 1305-1309, says:

"The reasoning upon which this double liability to punishment is maintained is not very satisfactory. It is not a cogent answer to the objection that the additional damages imposed for punishment in the civil action go to the injured party. He is not entitled to them if he is otherwise compensated; nor does the fact that this mulct goes to him instead of the state render its imposition any less a punishment, which is repeated and duplicated when, upon the same principle and for the same public purpose, he is fined again in a prosecution in the name of the state.

"When punitory damages are allowed the law uses the suit of a private party as an instrument of public protection, not for the sake of the suitor, but for that of the public. It is not the form of the action that gives the right to the jury to give such damages, but the moral culpability of the defendant. After there has been one trial in which his culpability has been tried with a view to punishment in the interest of the public any other trial for the same purpose, whatever may be the form of the proceeding, is in substance and effect putting the accused again in jeopardy of punishment for the same offense, and vexing him again for the same cause. Nor is the objection removed though the first verdict and the judgment thereon be provable on the second trial in mitigation, though this would, to the extent of the mitigation, lessen the injury resulting from double punishment."

In *Missie Picklesimer v. L. & N. Ry. Co.*, 194 N. C. 40,

138 S. E. 340, 52 A. L. R. 1330, the supreme court of North Carolina said:

"Punitive or exemplary damages, sometimes called 'smart money,' are allowed in cases where the injury is inflicted in a malicious, wanton, and reckless manner. They are not given with a view to compensation, but rather as a punishment to the defendant and as a warning to other wrongdoers. Nor are they allowed as a matter of course. The defendant's conduct must have been actually malicious or wanton, displaying a spirit of mischief *towards the plaintiff*, or of reckless and criminal indifference to *his rights*." (Italics supplied.)

(See, also, *Gill v. Selling*, 125 Or. 587, 267 P. 812, 58 A. L. R., 1556 and note.)

"It is generally said that punitive damages are awarded in view of the supposed aggravation of the injury to the *feelings of the plaintiff* by the wanton or reckless act of the defendant." (Italics supplied.)

*Erwin v. Milligan*, 188 Ark. 658, 67 S. W. 2d 592, 594; 8 R. C. L., p. 579, sec. 128; 17 C. J., p. 968, sec. 268.

*Punitive damages in a civil case are somewhat comparable to compensatory damages in a personal injury case for pain, suffering and mental anguish.*

In the present case, there is no claim made that defendant was even acquainted with the plaintiff or knew anything about who, if any one, owned the property he directed Gums to get. What he wanted was the property, and all he attempted to do was to secure the property. The record is silent as to whether respondent requested or expected Gums to steal the property or purchase it. However that may be, respondent did not take the property himself.

It has been held that, while the principal may be liable for compensatory damages for the act of his agent, he is not liable for *exemplary or punitive* damages for the agent's acts.

In *Lakeshore & M. S. R. Co. v. Prentice*, 147 U. S. 101, 13 S. Ct. 261, 263, 37 L. ed. 97, the Supreme Court of the United States said:

"Exemplary or punitive damages, being awarded, not

by way of *compensation* to the sufferer, but by way of punishment of the offender, and as a warning to others, can only be awarded *against one who has participated in the offense. A principal, therefore, though of course liable to make compensation for injuries done by his agent within the scope of his employment, cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive or malicious intent on the part of the agent.*" (Italics supplied.)

I think the judgment should be modified by disallowance of the $290.50 exemplary damages.

I am authorized to say that Mr. Chief Justice Budge concurs in the foregoing opinion.