Gregory SEAPHUS, Plaintiff,

v.

John LILLY, Rebecca Lilly, Susan O'Rourke (also known as Susan Stockton), Lawrence O'Rourke, Collectively d/b/a: "The 1940 West Greenleaf Condominium Association", Talman Home Mortgage Corporation, and the Talman Home Federal Savings and Loan Association of Illinois, Defendants.

No. 87 C 10085.

United States District Court, N.D. Illinois, E.D.

July 6, 1988.

Gregory Seaphus, Chicago, Ill., pro se.

Robert E. Davy, Jr., Mark F. Baggio, Lison & Associates, Chicago, Ill., for defendant John Lilly.

Terrence Hutton, Howe & Hutton, Ltd., Chicago, Ill., for defendant Susan O'Rourke.

James E. Trausch, John F. Brennan, Jaros, Tittle & O'Toole, Chicago, Ill., for defendant Talman Home Mortg. Corp.

## ORDER

BUA, District Judge.

This order concerns defendants' motion to dismiss plaintiff's *pro se* complaint for failure to state a cause of action. For the reasons stated herein, defendants' motion to dismiss is granted. Plaintiff is given leave to file an amended complaint (within 45 days of the date of this order) under conditions set forth below. An order appointing plaintiff counsel pursuant to 28 U.S.C. § 1915 will follow.

Plaintiff filed a 55–page *pro se* complaint in late 1987 alleging a litany of purported state and federal claims against individuals who at one time lived in neighboring units of a condominium complex where plaintiff resided and the financial institution which held a mortgage on plaintiff's residence. The complaint begins by describing various disputes which plaintiff encountered with other owners in the condominium complex. The complaint then relates events occurring after foreclosure and eviction proceedings were initiated by plaintiff's mortgagee.

Plaintiff's complaint is divided into thirteen "counts" which attempt to articulate separate claims for relief against defendants.[1] Although construing plaintiff's complaint in an extremely liberal manner, this court is compelled to recognize that several of plaintiff's "counts" are simply devoid of any legally significant facts. Thus, the following summary focuses on only those factual assertions having some possible rel-

---

1. The thirteen counts contained in plaintiff's complaint are entitled: "Defendants' Predisposition for Violence (Count I); Invasion of Plaintiff's Privacy (Count II); Early Discrimination against Plaintiff (Count III); Theft of Funds (Count IV); Illinois Condominium Property Act Fraud (Count V); Illinois Insurance Fraud (Count VI); Defamation of Reputation and Character (Count VII); Theft and Lock-out (Count VIII); Criminal Damage to Property (Count IX); Physical Assault (Count X); Attempted Murder (Count XI); Criminal Conspiracy and Fraud (Count XII); Racial Discrimination and Civil Rights Violations (Count XIII)."

evance to a cognizable claim under federal or state law.

## I.   FACTS

In 1977, plaintiff purchased Unit C in a three-unit condominium development located at 1940 West Greenleaf in Chicago, Illinois.   Defendants John and Rebecca Lilly (the "Lillys") owned Unit B in the development, and defendants Lawrence and Susan O'Rourke (the "O'Rourkes") owned Unit A.  Plaintiff's first encounter with the Lillys and O'Rourkes occurred while plaintiff was contemplating purchasing Unit C.   The Lillys and O'Rourkes obtained plaintiff's unlisted phone number from an architect of the complex and telephoned plaintiff to invite him to a meeting which took place in January 1978.   At the meeting, the Lillys and O'Rourkes asked plaintiff to delay purchasing Unit C to pressure the developer into making certain modifications to Units A and B.   Plaintiff apparently ignored defendants' request and closed on his prospective residence during late May 1978.  Defendant Talman Home Mortgage Corporation and the Talman Home Federal Savings and Loan Association of Illinois ("Talman Home") provided mortgage financing for the purchase.

Months after moving in, plaintiff was informed by his neighboring owners that he would be expected to attend the "1940 West Greenleaf Condominium Association" meetings.   Plaintiff attended the meetings and agreed to pay assessments ostensibly for the maintenance and care of the development's common elements.  Rebecca Lilly collected plaintiff's assessments on a monthly basis.   In early October 1979, plaintiff informed the Lillys and O'Rourkes that he would stop paying the assessment amount until proper safeguards and controls were put in place to ensure that plaintiff's assessments were being used appropriately.   In response, Susan O'Rourke subsequently filed a lien against plaintiff's property for the unpaid assessments.

In September 1982, the garage located behind the complex was damaged.  Apparently, the damage restricted plaintiff's use of his assigned garage space.   The insurance company providing coverage for the garage was contacted, and a claim adjuster was dispatched to inspect the damage.   After completing the inspection, the adjuster instructed plaintiff that two written repair estimates were needed before the claim could be processed.   After the necessary documentation was submitted, plaintiff was informed that a check would be issued to him for the lower of the two estimates.  Prior to payment of the insurance claim, plaintiff hired a contractor to repair the garage and paid him with personal funds.  Unknown to plaintiff, Susan O'Rourke called the adjuster and requested the check be issued to her rather than plaintiff.   The adjuster agreed and forwarded payment for the claim to her instead of plaintiff.  Upon learning that the insurance funds had gone to Susan O'Rourke, plaintiff demanded that he receive the proceeds of the check.  Susan O'Rourke, however, refused.

In 1974, plaintiff developed certain motivational learning programs for use in primary and secondary schools.   The programs focused on helping disadvantaged children excel scholastically through the use of various motivational techniques.  Plaintiff began to market his motivational programs to Chicago Public School officials.   Letters from certain schools in the Chicago Public School System indicated an interest in plaintiff's program ideas.   While plaintiff's programs were being considered, John Lilly contacted school officials and made derogatory comments about plaintiff's character.   Although the substance of the comments are not indicated, plaintiff classifies Lilly's conduct as "defamatory."  As a result of the derogatory statements, sales of the plaintiff's educational materials were impaired.   Plaintiff also asserts that John Lilly and Susan O'Rourke made "defamatory" comments about plaintiff to their family and friends.   Once again, details concerning the alleged statements are not provided.

In July of 1984, the Lillys and O'Rourkes changed the lock on the common door to the garage and did not give plaintiff a key.  This prevented plaintiff access to his

garage space. Soon after, plaintiff changed the lock on the common door and gave keys to the Lillys and O'Rourkes. A few weeks later, the Lillys and O'Rourkes changed the lock to the common door again and failed to give plaintiff a key.

In addition to the lock changes, defendants John Lilly and Susan O'Rourke damaged plaintiff's personal property beginning in 1981 and continuing to 1986. Plaintiff alleges that on November 21, 1984, John Lilly and Susan O'Rourke slashed the passenger-side tires of his car. During November 1984 to March 1986, John Lilly and Susan O'Rourke poured foreign substances into plaintiff's gas tank, damaged the paint, and committed other acts to plaintiff's car which rendered it inoperable. In April of 1985 plaintiff asserts he lost his teaching job at a community college located 50 miles from his home because he was left without transportation.

Plaintiff alleges that during 1982 to 1986 defendants John Lilly and Susan O'Rourke damaged plaintiff's real property by attempting to set fire to the door and entrance way of plaintiff's home, and placing "heavy objects" and barricades on plaintiff's patio and walkway.

On May 3, 1985, plaintiff alleges that John Lilly removed a delivery notice placed on plaintiff's front door. In addition, plaintiff alleges that on June 17, 1985, John Lilly opened a letter from Illinois Bell addressed to plaintiff and returned the letter more than a week later.

Plaintiff alleges four different "assaults" in his complaint. Plaintiff first alleges that in October 1984 defendant John Lilly altered the condominium's common water pipes so that he could regulate the water flow in plaintiff's unit. Apparently while altering plaintiff's plumbing, John Lilly and Susan O'Rourke placed foreign substances into plaintiff's water supply which made plaintiff ill. Second, in May of 1985, plaintiff asserts John Lilly "assaulted [him] in a public place in Schaumburg, Illinois." Plaintiff's complaint, however, does not state further facts describing this incident. Third, on November 20, 1985, John

Lilly intentionally struck plaintiff with his car injuring plaintiff's legs. Finally, on March 9, 1986, John Lilly allegedly "assaulted" plaintiff from behind while plaintiff entered his home. Plaintiff's complaint again does not detail any specific facts surrounding the March 1986 event.

Plaintiff alleges that all defendants, along with their attorneys, conspired to defraud and injure him. Plaintiff lost his job as a technician in September 1978 and was unable to find other employment. As a result, plaintiff incurred financial difficulties. In 1981, defendant Talman Home initiated foreclosure proceedings on plaintiff's home. Plaintiff alleges that upon notification of the foreclosure action he paid the amount in default and an additional $2,000 in attorneys' fees Talman Home had incurred initiating legal proceedings. Plaintiff asserts that the $2,000 in attorneys' fees was unjustified because Talman Home's attorneys did not perform any services.

In 1982, plaintiff filed bankruptcy. He alleges that his years of unemployment combined with having to pay Talman Home $2,000 in attorneys' fees forced him to file bankruptcy. On June 1, 1983, attorneys representing John Lilly and Susan O'Rourke filed a claim in bankruptcy court against plaintiff's estate. The claim stated plaintiff owed defendants unpaid assessment fees and attorney fees. Plaintiff alleges that John Lilly and Susan O'Rourke's attorneys continued to file claims in bankruptcy court against plaintiff and at times acted as advocates for Talman Home.

Plaintiff concludes his 55–page complaint by realleging all the defendants' acts stated in the complaint were racially motivated and therefore, violative of his constitutional rights.

## II. DISCUSSION

■ *Pro se* complaints are construed liberally to afford substantial justice to litigants unable to retain private counsel. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, *pro se* pleading may not be merely conclusory. *Martin v. Aubuchon*, 623 F.2d 1282, 1286

(8th Cir.1980). The complaint must allege facts which, if true, state a claim as a matter of law. *Id.*

Plaintiff premises jurisdiction on the existence of a federal question in Count XIII—whether defendants' actions violated his Fifth and Fourteenth Amendment rights. Most of plaintiff's remaining counts attempt to articulate pendent state law claims. Because this court resides in the Northern District of Illinois and all parties to this action are residents of Illinois, choice of law principles dictate that Illinois law will apply to plaintiff's pendent state law claims.

Counts I through III of plaintiff's *pro se* complaint fail to state facts which if true, state a claim as a matter of law. Count I contains facts about the O'Rourkes and Lillys' personal lives—each couple's marital history, subsequent divorce, and personal problems. Nothing in Count I gives rise to a claim for relief under federal or state law. As such, defendants' motion to dismiss with regard to Count I is granted.

■ Count II, entitled "Invasion of Plaintiff's Privacy" also fails to state a cause of action. Plaintiff believes that the Lillys and O'Rourkes invaded his privacy when they obtained plaintiff's unlisted telephone number from an architect of the condominium complex.

Four forms of invasion of privacy exist: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of the other's name or likeness; (3) publicity that unreasonably places the other in a false light before the public; and (4) unreasonable publicity given to the other's private life. *Geisberger v. Willuhn,* 72 Ill.App.3d 435, 28 Ill.Dec. 586, 390 N.E.2d 945, 948 (2d Dist.1979); *see also* Prosser and Keeton on Torts § 117 (5th Ed.1984). Obtaining an unlisted telephone number does not satisfy any of the four forms of invasion of privacy. The simple disclosure of private information to one other person, which is all that plaintiff asserts, is insufficient to state a claim for invasion of privacy. *Wood v. National Computer Systems, Inc.,* 814 F.2d 544, 546 (8th Cir.1987). As Count II

fails to state a cognizable claim for relief, defendants' motion to dismiss is granted.

■ Plaintiff labels Count III "Early Discrimination Against Plaintiff." Count III, which comprises eight of plaintiff's 55-page complaint, gives a detailed scenario of how plaintiff first came into contact with the O'Rourkes and Lillys and plaintiff's actions after the Lillys and O'Rourkes phoned him to arrange a meeting in January 1978. At this meeting, the Lillys and O'Rourkes asked plaintiff not to purchase Unit C until the developer completed repairs on their units. Count III notes that after the meeting, plaintiff called the developer for an appointment to discuss the purchase of Unit C. Plaintiff subsequently met with the developer and discussed various items concerning Unit C and what the O'Rourkes and Lillys asked plaintiff to do. Following this meeting, plaintiff called Mr. Sass, the architect, to arrange a meeting so plaintiff could inform Mr. Sass what the O'Rourkes and Lillys told plaintiff. In May 1978, plaintiff ignored defendants' request and closed on his prospective residence.

Despite the remarkable manner in which plaintiff details his first encounters with the Lillys and O'Rourkes, nothing asserted in Count III supports a claim for relief. The simple fact that the Lillys and O'Rourkes asked plaintiff to delay purchasing his condominium until certain modifications were completed in their units did not impair plaintiff's civil rights or prevent plaintiff from purchasing his residence. Plaintiff's conclusory allegations of discrimination are simply without factual substance. Thus, defendants' motion to dismiss Count III is granted.

■ In Count IV, plaintiff alleges that the Lillys stole money entrusted to them by plaintiff for the payment of assessments. Plaintiff asserts that he agreed to pay assessments for the upkeep of the complex' common elements. Apparently, the Lillys customarily collected assessments from plaintiff and forwarded them to Susan O'Rourke. In October 1979, the Lillys went to plaintiff and collected the monthly assessment. A few days later,

Rebecca Lilly visited plaintiff and allegedly stated that her husband had taken the assessment money they had collected from plaintiff and spent it. Plaintiff demanded the money be returned and informed the Lillys and O'Rourkes that he would no longer pay assessment fees until a safer system for insuring proper use of the assessments was developed.

In *Addante v. Pompilio*, 303 Ill.App. 172, 25 N.E.2d 123 (1st Dist.1940), the plaintiff deposited money with the defendant for transmission to a third party. The defendant neglected to forward the money and instead appropriated it for his own use. *Id.* Although the plaintiff made numerous demands for return of the entrusted money, the defendant failed to respond. *Id.* Based on the foregoing facts, the *Addante* court found that the plaintiff stated a tort claim for conversion of funds. *Id.* at 176, 25 N.E.2d at 125.

The instant case, when distilled to its basic allegations, is indistinguishable from *Addante.* In both, the plaintiffs entrusted money with the defendants for delivery to a third party. The Lillys, as the defendant in *Addante*, failed to remit the money and instead used it for unauthorized purposes. Despite demands for its return, the defendants refused to refund the entrusted sums. According to the holding in *Addante*, Count IV states a claim for conversion against the Lillys.

■ In Count V, plaintiff asserts that in October 1979 Susan O'Rourke moved the condominium association's checking account to a new bank without informing him. Apparently, because prior notice was not provided nor consent obtained, plaintiff concludes Susan O'Rourke defrauded him under the Illinois Condominium Property Act ("Act"). Ill.Rev.Stat. ch. 30 ¶¶ 301–324 (1987).

A reading of the Act, however, reveals no provision supporting plaintiff's claim. Paragraph 309 which concerns sharing of expenses and liens for nonpayment, describes what the manager of a condominium association's common expense fund must prepare and distribute to all unit owners. Paragraph 309 is devoid of any provi-sion requiring the manager to inform unit owners when changing banks or obtain prior unit owner approval. Although paragraph 319 states the manager shall maintain records for examination by unit owners or their agents, nothing in paragraph 319 places an affirmative duty on the manager to notify owners of changes in the location of association accounts. Paragraph 319 simply provides a right of access to such information upon inquiry. Plaintiff does not state that he ever asked to see the association's records or that he was refused access. As the Act did not require Susan O'Rourke to notify plaintiff or receive his permission prior to changing banks, defendants' motion to dismiss Count V is granted.

■ Count VI relates to Susan O'Rourke's failure to forward the insurance check issued for damage to the garage near plaintiff's designated parking place. The essence of the tort of conversion is that the tortfeasor wrongfully exercises dominion and control over the personal property owned by another. *National Acceptance Co. v. Pintura Corp.*, 94 Ill. App.3d 703, 50 Ill.Dec. 120, 123, 418 N.E.2d 114, 117 (2d Dist.1981). Although Illinois follows the common law rule which does not recognize an action for conversion of intangible rights, Illinois does recognize a cause of action for conversion of commercial paper, such as a check, on the theory that the intangible right is merged into a specific document. *Daniels v. Powell*, 604 F.Supp. 689, 696 (N.D.Ill.1985) *citing People v. Roth, Inc.*, 412 Ill. 446, 107 N.E.2d 692 (1952). To plead a claim for conversion in Illinois, a plaintiff must allege the following elements: (1) a property interest in the chattel at issue and a right to immediate possession; (2) a demand for possession; and (3) an intentional and unauthorized assumption of control or ownership over the chattel by defendant. *Naiditch v. Shaf Home Builders, Inc.*, 160 Ill.App.3d 245, 111 Ill.Dec. 486, 500–01, 512 N.E.2d 1027, 1041–42 (2d Dist.1987).

Plaintiff asserts he was told that the insurance company would issue him a check for insured damage to the complex'

garage. Construing plaintiff's allegations liberally, this court must assume that plaintiff was the insured party who was entitled to receive the proceeds of an insurance claim for damage to the complex' common elements. As such, plaintiff adequately pleads an interest in the insurance check and a right to immediate possession. Susan O'Rourke's alleged interception of plaintiff's insurance check and refusal to return the proceeds when asked meet the latter two requirements for conversion under Illinois law. As such, Count VI pleads a valid cause of action for conversion against Susan O'Rourke.

■ Count VII alleges that John Lilly and Susan O'Rourke defamed plaintiff by making derogatory comments about plaintiff's character to family, friends, and Chicago Public School officials. However, Count VII does not contain any description of the derogatory comments that the defendants allegedly made. Generally, a defamation plaintiff fails to satisfy the requirements of notice pleading unless he specifically states the words alleged to be actionable. *Derson Group, Ltd. v. Right Management Consultants, Inc.*, 683 F.Supp. 1224, 1229 (N.D.Ill.1988); *see also Herbert v. Lando*, 603 F.Supp. 983, 990 (S.D.N.Y.1985), *rev'd in part on other grounds*, 781 F.2d 298 (2d Cir.1986); *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8th Cir.1979) (the use of *in haec verba* pleadings on defamation charges is favored because knowledge of the exact language used is necessary to form responsive pleadings). Count VII is devoid of any specific statements which John Lilly and Susan O'Rourke allegedly made to third parties about plaintiff. In the absence of such allegations, plaintiff's claim for defamation is defective. Thus, Count VII is dismissed.

Plaintiff claims in Count VIII of his complaint that the Lillys and O'Rourkes prevented him from using his assigned garage space by changing the lock on a common door leading to the complex' garage. Plaintiff styles this claim as "lock-out" and asserts he is entitled to monetary relief. Plaintiff also complains in Count VIII that John Lilly committed acts of "mail theft."

Plaintiff asserts that John Lilly opened a letter addressed to plaintiff and later placed the opened letter in plaintiff's mailbox. Plaintiff also alleges that John Lilly stole a delivery notice that was placed on plaintiff's door.

■ Illinois does not recognize a cause of action for "lock-out." Plaintiff's allegations concerning the Lillys and O'Rourkes' attempts to exclude him from common elements of the condominium would at best give rise to an equitable action for ejectment. As an owner of one of many units in a condominium complex, plaintiff holds title to common areas of the complex with other unit owners as tenants in common. In Illinois a tenant in common of realty may use and enjoy common estate in the same manner as though he were sole owner and may occupy and utilize every portion of the property, but has no right to exclude cotenants or to appropriate any particular portion of property for his sole use. *Massman v. Duffy*, 333 Ill.App. 30, 76 N.E.2d 547, 552 (1st Dist.1947). When one cotenant assumes exclusive possession of realty and denies other cotenants the right to use and enjoy the same, an equitable action for ejectment arises. *Grubmeyer v. Mueller*, 385 Ill. 529, 53 N.E.2d 438, 441–42 (1944).

In the present case, plaintiff presents no authority for the proposition that a former cotenant who was temporarily excluded from certain common areas by other cotenants possesses a claim for damages under Illinois law. As noted, the only possible claim plaintiff may pursue is an action for ejectment. However, plaintiff no longer owns Unit C nor resides at 1940 West Greenleaf. Plaintiff also indicates that the Lillys and O'Rourkes have also moved from the condominium complex. Any claim plaintiff may have had for ejectment is thus moot.

■ The second part of Count VIII concerning John Lilly's alleged acts of mail theft also fails to state a cognizable claim for relief. Plaintiff is correct in asserting that it is a federal offense to steal a letter placed in the United States mail from a letter box or mail receptacle. *See* 18 U.S.C. § 1708. However, the fact such conduct

may violate a federal criminal statute does not accord a private litigant with a civil cause of action for damages. As with several of plaintiff's other theft claims, plaintiff's "mail theft" allegations must be analyzed as possible conversions.

Although plaintiff asserts that he knew John Lilly opened a letter addressed to plaintiff and later placed it in plaintiff's mailbox, nowhere does plaintiff indicate how Lilly first came into possession of the letter. The letter may have been mistakenly delivered to Lilly and accidentally opened. Plaintiff makes no allegation that Lilly ever assumed unauthorized control over the letter or that plaintiff demanded that he return it. To the contrary, plaintiff admits that the letter in question, a telephone bill, was placed in his mailbox a short time later. As to the delivery notice that John Lilly allegedly removed from plaintiff's door, one questions whether plaintiff can even say that he owned the slip of paper the delivery person left behind. Similarly, because plaintiff states that he knew John Lilly took the notice, it is not at all clear what damage plaintiff suffered. After all, the package, not the delivery notice is the item to which plaintiff was entitled. Moreover, plaintiff does not allege that he ever demanded that Lilly return the notice. Although this court is mindful that plaintiff prepared his complaint without the benefit of counsel, plaintiff must realize that not every mischievous act gives rise to a claim for damages. As plaintiff's allegations concerning John Lilly do not state claims for the tort of conversion, and plaintiff's possible claim for ejectment is moot, defendants' motion to dismiss Count VIII is granted.

■ Count IX, entitled "Criminal Damage to Property," alleges in part that John Lilly and Susan O'Rourke set fire to the door of his unit, threw "heavy objects" onto his patio, and placed barricades on his walkway. One who without permission places or causes to be placed any structure or object on the land of another commits a trespass for which the law provides a civil remedy. *Lake Shore Bldg. Co. v. City of Chicago,* 207 Ill.App. 244 (1st Dist.1917).

Where buildings or fixtures are damaged by trespass, the measure of recovery is the cost of repair or of restoring the premises to their original condition. *Ariola v. Nigro,* 16 Ill.2d 46, 156 N.E.2d 536 (1959). Plaintiff's assertion that John Lilly and Susan O'Rourke intentionally damaged his front door and cluttered his patio and walkway with "heavy objects and barricades" fits squarely within the law of trespass and gives rise to a claim for both nominal and compensatory damages.

■ Count IX also asserts that John Lilly and Susan O'Rourke slashed plaintiff's car tires, poured foreign substances into his gas tank, and committed other acts of vandalism eventually rendering his car unusable. If, a person intending to do so, damages an item of personal property belonging to another so as to render it useless and beyond repair, a conversion of the chattel results. *See* Prosser and Keeton on Torts § 15 (5th Ed.1984); *citing Klam v. Koppel,* 63 Idaho 171, 118 P.2d 729 (1941) (where parts of a tractor were removed and others were smashed with a sledge-hammer, conversion of the tractor occurred). Where damage intentionally inflicted on personal property belonging to another does not result in complete destruction of the item, a claim for trespass to chattel will lie. *See* Prosser and Keeton on Torts § 15 (5th Ed.1984). Whether plaintiff possesses a claim for trespass to chattels or conversion will turn on the severity of damage to the automobile. Though plaintiff indicates his car became "disabled" as a result of defendants' actions, he fails to indicate if it was damaged beyond repair. Construing the assertions in Count IX in a light most favorable to plaintiff, alternate claims for conversion and trespass to chattel against John Lilly and Susan O'Rourke are stated. As such, Count IX states claims for trespass to realty and trespass to chattel or conversion.

■ Counts X and XI concern four "assaults" defendants allegedly committed against plaintiff between 1984 and 1986. Count X asserts two "assaults" involving John Lilly in May 1985 and March 1986. Count X reads in relevant part:

In May 1985 defendant John Lilly, having established the pattern of following plaintiff and confronting him with threats, assaulted plaintiff in a public place in Schaumburg, Illinois.... On March 9, 1986 defendant John Lilly executed the even more cowardly act and assaulted plaintiff from behind while plaintiff was entering his home.

Although closely related to the tort of battery, an assault is defined "as an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Parrish v. Donohue*, 110 Ill.App.3d 1081, 66 Ill.Dec. 860, 862, 443 N.E.2d 786, 788 (3d Dist.1982). Illinois courts define battery "as the willful touching of another or a successful attempt to commit violence on the person of another." *Id.*

Count X, as presently drafted, fails to contain sufficient facts to plead either a claim for assault or battery. Rather, only conclusions are stated. Rule 8 of the Federal Rules of Civil Procedure requires pleadings to contain a short and plain statement of the claim showing that the pleader is entitled to relief. Count X fails to meet Rule 8 because plaintiff fails to describe the two incidents involving John Lilly in detail necessary to ascertain whether the elements of assault or battery are met. Accordingly, Count X must be dismissed. Plaintiff, however, is given leave to amend Count X to plead additional facts necessary to state claims for assault and battery if the two incidents involving John Lilly meet the definitions noted above.

In Count XI plaintiff asserts that John Lilly and Susan O'Rourke altered the water pipes in his unit and intentionally introduced a foreign substance into plaintiff's water supply. Plaintiff unknowingly drank the water and became ill. Count XI also relates an alleged incident occurring in November 1985 involving John Lilly. While plaintiff was working on his car in an alley behind the condominium complex, John Lilly arrived in his car and began to observe plaintiff. When plaintiff walked away from his car, Lilly accelerated his car and attempted to run plaintiff down. Lilly's car struck plaintiff and injured his legs. After striking plaintiff, Lilly sped into his garage and closed the door.

Both incidents described in Count XI state claims for battery. By intentionally causing foreign substances to enter plaintiff's water supply and allowing plaintiff to ingest the tainted water without warning, John Lilly and Susan O'Rourke committed a willful and unauthorized touching of plaintiff for which damages can be awarded. However, because plaintiff was unaware the water was tainted and never perceived an imminent threat of bodily harm, no claim for assault exists. Plaintiff's claim regarding the hit-and-run incident with John Lilly is a different matter. Lilly's conduct on November 9, 1985 constituted both an assault and battery. Plaintiff was in the reasonable apprehension of being intentionally struck by Lilly as he operated his car. Lilly succeeded in intentionally striking plaintiff and injuring his legs. Thus, Count XI states claims for one assault and two batteries.

In Count XII, plaintiff alleges that all defendants conspired to defraud and injure him by filing various legal claims against him during state foreclosure and federal bankruptcy proceedings. In 1981, plaintiff's mortgage fell into default. Although Talman Home and plaintiff attempted a variety of repayment plans, defaults continued and foreclosure proceedings were eventually initiated. Shortly after plaintiff received notice of the foreclosure, he arranged to pay the amount in default and an additional $2,000 in attorneys' fees Talman Home incurred as a result of the foreclosure proceedings. Plaintiff complains that the $2,000 in fees was unjustified because Talman Home's attorneys did not perform work sufficient to support the amount charged.

In 1982, plaintiff filed bankruptcy allegedly because of his lengthy unemployment and the $2,000 he had paid in attorneys' fees. In June 1983, attorneys representing John Lilly and Susan O'Rourke filed a

claim against plaintiff's bankrupt estate for unpaid assessments and attorneys' fees. Lilly and O'Rourke's attorneys filed subsequent claims against plaintiff's estate and at times acted as advocates for Talman Home. Finally, at the end of Count XII, plaintiff alleges that all defendants conspired with their attorneys to defraud plaintiff by failing to follow various rules of procedure in state and bankruptcy courts.

The facts alleged in Count XII make clear that Talman Home was entitled to foreclose on the mortgage plaintiff had executed on his condominium because of delinquencies in payment. Presumably, mortgage instruments signed by plaintiff contained the common provision that the mortgagor was responsible for all legal fees incurred by the mortgagee in collecting payment. Plaintiff seems to suggest that the amount of attorneys' fees charged to him as a result of Talman Home's first attempt to foreclosure was excessive because he was unable to determine what legal work had been done.

Plaintiff does not suggest that Talman Home was not entitled to recover its legal fees. Rather, plaintiff seems to argue that $2,000 was excessive. Plaintiff indicates he has written to Talman Home's lawyers and requested a refund. Whether the amount of fees paid by plaintiff was in fact excessive is irrelevant to "conspiracy" claims asserted against the defendants named in this action. Instead, it is a claim for possible attention by the Attorney Registration and Disciplinary Commission.

██ Plaintiff also suggests that it was improper for John Lilly and Susan O'Rourke's attorneys to file claims against him in bankruptcy. Irrespective of the bad feelings which existed between plaintiff and the defendant unit owners, plaintiff obligated himself to contribute monthly assessments for the maintenance and care of the condominium complex in which he lived. Plaintiff indicates that he discontinued paying monthly assessments in October 1979. John Lilly and Susan O'Rourke, as neighboring owners in the condominium complex, became creditors of plaintiff for the unpaid assessments. The purpose of bankruptcy is to total up all the bankrupt's assets and liabilities and distribute the assets proportionately to the creditors. In order for a creditor to receive a share of the bankrupt estate a claim must be filed. Because John Lilly and Susan O'Rourke were creditors of plaintiff, they were entitled to assert a claim against plaintiff's bankrupt estate. The fact they did so and plaintiff was adversely affected does not give plaintiff a claim for civil conspiracy to injure and defraud. Similarly, since plaintiff refused to pay assessments after October 1979, claims for delinquent assessments arose on a monthly basis. Thus, the fact successive claims were asserted by Lilly and O'Rourke should be of little surprise to plaintiff.

██ Plaintiff's complaints concerning alleged incidents of co-representation by defendants' attorneys also fail to state any colorable action for civil conspiracy. Although a potential conflict of interest may arise when counsel for one creditor acts on behalf of a second creditor during bankruptcy proceedings, the bankrupt debtor is without standing to challenge such co-representation. Rather, only parties whose interests might be compromised by such representation may complain. Neither Talman Home nor the other defendants express any dissatisfaction with the actions of their attorneys. Thus, the fact certain defendants' attorneys may have acted as advocates for other defendants presents no support for plaintiff's claim.

██ Last in Count XII, plaintiff asserts that defendants, with their attorneys, furthered their conspiracy to injure and defraud him by failing to follow relevant rules of civil procedure in state and bankruptcy court. While plaintiff's allegations concerning procedural violations must be taken as true, such complaints should be directed to the courts in which the procedural infractions occurred. If a judgment entered is based on fraud or mistake, the court within a certain reasonable time may entertain a motion to vacate. If such motion is denied, an aggrieved party may exercise his right to appeal. Similarly, if a

court's judgment rests on a misapplication of law, appealing from the adverse decision is the next appropriate step. Cranking up a separate suit challenging procedural violations in other courts which allegedly resulted in erroneous judgments is simply not permitted. In Count XII plaintiff essentially seeks to relitigate the propriety of the judgment of foreclosure concerning his residence and the adjudication of defendants' claims against plaintiff's bankrupt estate. The doctrines of *res judicata* and collateral estoppel prohibit plaintiff from collaterally attacking those judgments in this court. Plaintiff's only avenue of relief leads to the courts which entered the judgments of which plaintiff complains. As nothing pled in Count XII supports plaintiff's conspiracy claim, defendants' motion to dismiss Count XII is granted.

Finally, in Count XIII plaintiff alleges that all of defendants' acts described in his complaint were racially motivated and designed to force him from his home. Plaintiff asserts that defendants' actions were taken "under color of both federal and State laws" and therefore violated his rights under the Fifth and Fourteenth Amendments.

Although plaintiff's reliance on the Fifth and Fourteenth Amendments is somewhat misplaced, plaintiff's allegations that certain defendants used various acts of violence to force him from his home may state a colorable claim under the Fair Housing Act, 42 U.S.C. § 3601 et seq. However, before reaching the applicability of the Fair Housing Act to plaintiff's allegations, issues relating to plaintiff's Fifth and Fourteenth Amendment claims must be addressed.

The Constitution proscribes governmental, not private conduct. *Murphy v. Mount Carmel High School*, 543 F.2d 1189, 1193 (7th Cir.1976). Unless acting as an authorized agent of a governmental body, a private person's conduct is not regulated by the Constitution. The Constitution simply protects individuals from oppression by governmental actors, not from private acts of villainy. *Baer v. Baer*, 450 F.Supp. 481, 496 (N.D.Cal.1978).

■ In the present case, plaintiff apparently believes that defendants' attorneys, acting as "officers of the court," assumed governmental roles in carrying out defendants' plan to oust plaintiff from his home. This contention is patently frivolous. Attorneys representing private litigants in civil suits act on behalf of their clients, not the state or federal government. Though attorneys may be considered officers of the court, they are not agents of the court and do not perform judicial functions. As the named defendants are purely private parties and at no time acted through their attorneys as agents of the state or federal government, plaintiff's constitutional claims must be dismissed.

■ Despite plaintiff's inability to characterize defendants' acts as violative of his constitutional rights, Count XIII contains sufficient allegations for a possible claim under the Fair Housing Act. The present action bears striking resemblance to the facts in *Stackhouse v. DeSitter*, 566 F.Supp. 856 (N.D.Ill.1983) *modified,* 620 F.Supp. 208 (N.D.Ill.1985). In that case, Stackhouse, a black resident of Cicero, Illinois brought civil rights and fair housing claims against DeSitter, a white neighbor, who allegedly employed various acts of violence and intimidation to induce Stackhouse to move from his home. DeSitter allegedly firebombed Stackhouse's parked car and then pelted Stackhouse with stones and ice as he attempted to drive his vehicle from the scene. *Stackhouse*, 566 F.Supp. at 858. Stackhouse also alleged that DeSitter broke a window and slashed the tires of his automobile. *Id.* Stackhouse asserted that DeSitter's actions were racially motivated and designed to deny him the same rights as white citizens to enjoy housing. *Id.*

In a series of two published orders, the court determined that although Stackhouse failed to articulate viable civil rights claims under 42 U.S.C. §§ 1981 and 1982, Stackhouse stated a claim under § 817 of the Fair Housing Act, 42 U.S.C. § 3617. Relying on *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the *Stackhouse* court ruled that although §§ 1981 and 1982 are designed to

bar various types of private discrimination, the language of the statutes does not encompass every act of racial discrimination which is somehow related to housing. *Stackhouse*, 566 F.Supp. at 858–59, *Stackhouse*, 620 F.Supp. at 209–10. Reiterating the Supreme Court's observations in *Jones* that sharp contrasts exist between protections offered by the Fair Housing Act and those contained in other civil rights laws, the court determined that Stackhouse's complaint failed to state claims under §§ 1981 and 1982. *Id.* However, the court determined that Stackhouse's claim under § 817 of the Fair Housing Act was a different matter. Section 3617 provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title. This section may be enforced by appropriate civil action.

The *Stackhouse* court concluded that § 3617 makes it unlawful to coerce, intimidate, threaten, or interfere with any person in three distinct circumstances: "(1) in the exercise or enjoyment of any right protected by §§ 3603–3606; (2) on account of the person having exercised or enjoyed such a right; and (3) on account of his having aided or encouraged any other person in the exercise or enjoyment of such a right." *Stackhouse*, 620 F.Supp. at 210–11.

The court noted Stackhouse alleged that after he exercised his right to rent an apartment free of racial discrimination, De-Sitter attempted to drive him from the previously all-white neighborhood through acts of violence and intimidation. *Id.* at 211. Finding that such allegations fell squarely within the second type of conduct prohibited by § 3617, the court sustained Stackhouse's claim under the Fair Housing Act. *Id.*

This court finds the reasoning in *Stackhouse* persuasive and applicable to the facts in the present case. In both *Stack-house* and the instant case, black residents alleged that white neighbors attempted to frighten them from their homes shortly after moving into predominantly white neighborhoods. Both plaintiffs alleged that the white defendants used various acts of violence and property damage to induce plaintiffs to leave their homes because of their race. Although §§ 1981 and 1982 may not reach the types of discriminatory conduct alleged in plaintiff's instant complaint, *Stackhouse* makes clear that a claim under § 817 of the Fair Housing Act may exist.

The basis of this court's jurisdiction rests on plaintiff's federal constitutional claims in Count XIII. Jurisdiction to entertain plaintiff's various state law claims rests on the doctrine of pendent jurisdiction. Thus, jurisdiction to adjudicate plaintiff's state law claims is dependent on the existence of a valid federal claim. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

As presently drafted, Count XIII only seeks relief under the Fifth and Fourteenth Amendments. For reasons noted earlier, plaintiff fails to plead any viable constitutional claims against defendants. For this reason, defendants' motion to dismiss Count XIII is granted and plaintiff's complaint is dismissed for lack of federal jurisdiction. However, because the allegations contained in Count XIII may give rise to a claim under § 817 of the Fair Housing Act, plaintiff is given leave to file an amended complaint within 45 days of the date of this order. Moreover, because this court finds that plaintiff meets the requirements of 28 U.S.C. § 1915, this court shall enter a separate order appointing counsel to represent plaintiff in this action.

In filing an amended complaint, plaintiff is limited to asserting only those claims determined above to have merit. Plaintiff will not be permitted to reallege facts which this court has found to be without legal significance or to reassert claims previously dismissed as groundless. It is this court's intention that appointed counsel will assist plaintiff in streamlining his claims

and preparing plaintiff's case for a trial on the merits.

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted, and plaintiff's complaint is dismissed in its entirety. Plaintiff is given leave to file an amended complaint within 45 days of the date of this order. An order appointing plaintiff counsel pursuant to 28 U.S.C. § 1915 shall issue.

IT IS SO ORDERED.